In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1743

Richard M. Fogel, as Trustee for the Estate
of Madison Management Group, Inc.,

Plaintiff-Appellee,

v.

Samuel Zell, et al.,

Defendants-Appellees.


Appeal of:  City and County of Denver.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 93 CV 04777--Ann Claire Williams, Judge.


Argued June 9, 2000--Decided July 19, 2000


 Before Posner, Chief Judge, and Bauer and Rovner,
Circuit Judges.

 Posner, Chief Judge.  A trustee in bankruptcy
settled an adversary proceeding that he had
brought against Samuel Zell and various
individuals and corporations associated with him,
claiming that they had looted the debtor's
estate. As a condition of the settlement, the
district court, having taken over the adversary
proceeding from the bankruptcy court because the
defendants had requested a jury trial, see 28
U.S.C. sec.sec. 157(d), (e), enjoined Denver from
suing Zell and the other adversary defendants.
Denver's appeal asks us to consider whether the
potential legal claim of a potential tort victim
is a "claim" within the meaning of the Bankruptcy
Code; if it is, what kind of notice such a
"claimant" is entitled to from the trustee; and
the extent to which a bankruptcy court can enjoin
the prosecution of claims against the defendants
in an adversary proceeding in order to facilitate
the settlement of the proceeding.

 The story begins with Interpace Corporation, a
manufacturer, now defunct, of prestressed
concrete pipe used in sewer and sanitation

systems. During the 1970s, the pipe that Interpace sold to some 10,000 purchasers was defective, though this was not realized at first. Meanwhile, in the mid-1980s, through a complex system of transactions unnecessary to describe, Interpace was acquired by Madison Management. Then the pipes began to burst, and Madison's owners--Zell and the other adversary defendants-- removed Madison's assets, lest Madison be held liable for its predecessor's torts. The removal left Madison a shell that declared bankruptcy under Chapter 11 of the Bankruptcy Code in 1991. Later, as so often happens, the Chapter 11 proceeding (reorganization) was converted to a Chapter 7 proceeding (liquidation).

By the time Madison declared bankruptcy, eight purchasers of Interpace pipe, not including Denver however, had sued Madison, seeking damages in excess of $300 million, for harms caused by the bursting of the defective pipe. Madison's trustee in bankruptcy, seeking to obtain assets for distribution to the creditors, brought this adversary proceeding, charging that Zell and others had fraudulently conveyed Madison's assets to themselves in order to avoid having to make good on the tort claims arising from the burst pipes.

The bankruptcy court set a deadline of April 5, 1993, for the filing of proofs of claim with the trustee. A brief notice to that effect was published in USA Today and Waterworld Review. The deadline came and went without Denver filing a claim. But its pipes hadn't burst yet. That didn't happen until May 23, 1997. On the following January 9, having confirmed that the pipe had been manufactured by Interpace, Madison's predecessor, Denver filed a proof of claim with the trustee. The claim was for more than $17 million in damages for the harm caused by the burst pipes and for the expense of replacing the rest of the Interpace pipe that Denver had bought, before it burst too. It appears that Denver and the eight pipe claimants that filed timely proofs of claim in the bankruptcy proceeding are the only purchasers of Interpace pipe who have as yet sustained damages because of the defective pipe.

The fraudulent-conveyance action brought by the trustee against Zell and his fellow alleged looters was settled a few months after Denver filed its claim. In exchange for the trustee's agreeing to release his claim against them, the adversary defendants agreed to pay him whatever amount, estimated to be between $35 and $45 million, would enable creditors of Madison whose claims had been filed by the April 5, 1993, deadline to receive 70 cents on the dollar.

Claims such as Denver's, however, that had been filed later would receive nothing. The eight timely pipe claimants are not among the creditors benefited by the settlement either, but that is because one of the adversary defendants in effect bought their claims, paying $24 million, which was less than 10 percent of what those claimants had originally sought.

The settlement between the adversary defendants and the trustee was made expressly contingent on the district court's enjoining all of Madison's creditors, including pipe claimants, from suing the adversary defendants. Denver had already filed suit against those defendants in a state court in Colorado. Its suit was closely modeled on the trustee's fraudulent-conveyance suit. Because Zell and the other adversary defendants were not the manufacturer of the defective pipe or even the successor of the manufacturer (Interpace), but rather the alleged looters of the successor's assets, Denver's claim against them, as distinct from the claim that it had filed against Madison in the bankruptcy proceeding, could not be, and was not, a products-liability claim.

The district judge found that Denver knew by October of 1990 that the pipe it had bought from Interpace might be defective, and so should have filed a proof of claim with Madison's trustee in bankruptcy before the bar date two and a half years later. Other Interpace pipe, bought at the same time, had already burst; and Denver had even played host to a conference at which representatives of a number of municipalities that had bought such pipe discussed the likelihood that it would burst. The judge's finding that Denver knew about the defect in its pipe before Madison went into bankruptcy is contested, but for purposes of this appeal we can assume that it's correct. The judge ruled that by failing to file a proof of claim by the bar date, Denver had forfeited any right it might have had to object to a settlement that gave it nothing. And so the judge proceeded to consider whether the settlement was in the best interests of the debtor's estate, Denver's interest notwithstanding. She concluded that it was, because it would avoid costly and protracted litigation and add sufficient assets to the estate to enable a handsome recovery, by normal bankruptcy standards, by those creditors (other than the timely pipe claimants, who had settled separately) that had filed timely proofs of claim. Since the settlement was contingent on enjoining suits by all pipe claimants against the adversary defendants, the judge, to make sure that the settlement would go through, granted the injunction sought by the trustee and the

adversary defendants against Denver's state court suit against the latter. The consequence of the judge's rulings was to block Denver from recovering any of the losses that it has sustained as a result of the bursting of the defective pipe, since Interpace no longer exists, the Madison bankruptcy yielded nothing for Denver, and Denver's state-court suit against the alleged looters is enjoined.

Judges naturally prefer to settle complex litigation than to see it litigated to the hilt, especially when it is litigation in a bankruptcy proceeding--the expenses of administering the bankruptcy often consume most or even all of the bankrupt's assets. The trustee's adversary proceeding against Zell and the other alleged looters promised to be hard-fought; the parties had already been at each other's throats for six years. Much of the property of the debtor's estate might be eaten up in that litigation, which in the end might fail to recover a penny for the estate. It was natural for the judge to prefer a $45 million bird in the hand to birds of unknown number and value in dense thickets. But this is on the assumption that Denver, whose claim exceeds $17 million, and any other purchaser from Interpace whose pipes burst after April 5, 1993, deserved to receive zero cents on the dollar because they should have filed claims before that deadline. If the judge was wrong to fault Denver for filing later, an essential premise of her decision to approve the settlement and issue the injunction collapses.

On whether Denver filed its proof of claim too late, it is uncertain, to begin with, whether it could have filed a claim before its pipes burst, which didn't happen until 1997, long after the bar date for filing proofs of claim. A "creditor" in bankruptcy is anyone who has a "claim" against the bankrupt estate that arose (so far as bears on this case) no later than the filing of the voluntary petition in bankruptcy. 11 U.S.C. sec.sec. 101(10), 301; In re Chicago Pacific Corp., 773 F.2d 909, 916 (7th Cir. 1985); In re Gucci, 126 F.3d 380, 388-89 (2d Cir. 1997). "Claim" is broadly defined to include equitable as well as legal rights to payment, and even "contingent" such rights. 11 U.S.C. sec. 101(5)(A); McClellan v. Cantrell, No. 99-3923, 2000 WL 876933, at *4 (7th Cir. July 5, 2000). A claim implies a legal right, however, and before a tort occurs the potential victim has no legal right, "contingent" or otherwise, with an exception, irrelevant to this case, noted in the next paragraph, for the case in which the potential tort victim incurs reasonable costs to prevent the tort from occurring or to mitigate its severity. A right that can be made the basis

of a claim in bankruptcy may be contingent on something happening, such as the signing of a contract, e.g., In re Remington Rand Corp., 836 F.2d 825, 827 (3d Cir. 1988); In re M. Frenville Co., 744 F.2d 332, 336-37 (3d Cir. 1984), but if the contingency can be the tort itself, this spells trouble, both practical and conceptual. Suppose a manufacturer goes bankrupt after a rash of products-liability suits. And suppose that ten million people own automobiles manufactured by it that may have the same defect that gave rise to those suits but, so far, only a thousand have had an accident caused by the defect. Would it make any sense to hold that all ten million are tort creditors of the manufacturer and are therefore required, on pain of having their claims subordinated to early filers, to file a claim in the bankruptcy proceeding? Does a pedestrian have a contingent claim against the driver of every automobile that might hit him? We are not alone in thinking that the answer to these questions is "no." See In re Chateaugay Corp., 944 F.2d 997, 1003 (2d Cir. 1991). Driving carelessly is not a tort and neither is the sale of a defective product. The products-liability tort occurs when the defect in the design or manufacture of the product causes a harm, and this didn't happen to Denver until the defective pipes burst. It is a fundamental principle of tort law that there is no tort without a harm, e.g., Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic, 152 F.3d 588, 592 (7th Cir. 1998); Janmark, Inc. v. Reidy, 132 F.3d 1200, 1202 (7th Cir. 1997); Jones v. Searle Laboratories, 444 N.E.2d 157, 162 (Ill. 1982); W. Page Keeton et al., Prosser and Keeton on the Law of Torts sec. 30, p. 165 (5th ed. 1984), and so until the harm occurs, the tort hasn't occurred.

It is true that when Denver learned it had installed defective pipe, it would have been entitled by the doctrine of mitigation of damages to remove the pipe or take other prophylactic or reparative measures, and to seek restitution of the expense of doing so from Madison, provided the expense was prudent in the circumstances. Adams v. U.S. Homecrafters, Inc., 744 So. 2d 736, 739 (Miss. 1999); Restatement (Second) of Torts sec. 919(1) (1979). Had Denver incurred such an expense before April 5, 1993, it would have had to file a proof of claim for reimbursement by then, provided it had received reasonable notice of the bankruptcy proceeding, a question to which we'll return. But it did not incur any such expense, and so until the pipes burst it had not suffered a legal wrong at the hands of Madison. No argument is made that it should have filed a claim for breach of contract against Madison.

There has been, however, understandable pressure

to expand the concept of a "claim" in bankruptcy in order to enable a nonarbitrary allocation of limited assets to be made between present and future claimants. Consider the asbestos bankruptcy cases. Many people who inhaled asbestos in the workplace in the 1940s developed serious diseases as a delayed consequence of this inhalation. Some developed the diseases earlier than others. It seemed arbitrary to devote the entirety of the estates of the bankrupt asbestos manufacturers to compensating those sufferers whose diseases had happened to manifest themselves before rather than after (perhaps shortly after) the bar dates set in the various bankruptcy proceedings. Since the inhalation had occurred before the bar dates, there was a sense in which the inhalers' tort claims could be thought to have accrued at that time even if they couldn't have sued to enforce the claims until symptoms of disease, or at least discernible changes in lung or other tissues (which might be enough to constitute harm within the meaning of the rule that there is no tort without a harm), manifested themselves. To recognize a "contingent" tort claim in these circumstances would complicate bankruptcy proceedings some, and perhaps a good deal, by requiring that provision be made in the allocation of the assets of the debtor's estate for future claims that might be difficult to value, but it might be a price worth paying to eliminate an arbitrary difference in treatment. In re UNR Industries, Inc., 725 F.2d 1111, 1118-20 (7th Cir. 1984). An analogy could be drawn--we drew a similar analogy in an insurance case involving defective pipes, Eljer Mfg., Inc. v. Liberty Mutual Ins. Co., 972 F.2d 805 (7th Cir. 1992)--between inhaling a potentially dangerous substance and installing potentially defective pipe in the body politic; each is a ticking-time-bomb kind of case.

 We did not need to resolve the "contingent" tort claim issue in the UNR case. Several courts found in 11 U.S.C. sec. 1109(b), which allows any "party in interest" to raise and be heard on issues relating to the bankruptcy proceeding, the authority to appoint representatives for future asbestos claimants. E.g., In re Amatex Corp., 755 F.2d 1034, 1041-43 (3d Cir. 1985); In re Johns-Manville Corp., 52 B.R. 940, 943 (S.D.N.Y. 1985); In re Forty-Eight Insulations, Inc., 58 B.R. 476, 478 (Bankr. N.D. Ill. 1986). Eventually Congress stepped in and, in effect, ratified the settlement terms that the representatives of these future claimants had negotiated. 11 U.S.C. sec. 524(g)(1)(B). In other cases, too, in which mass tort claims had precipitated sellers into bankruptcy, courts, including our own, began allowing products-liability and nuisance claims to be filed in bankruptcy as long as the conduct

giving rise to the claim (the manufacture or sale of the defective product, in the case of products liability) had occurred before the petition in bankruptcy had been filed. E.g., In re UNR Industries, Inc., 20 F.3d 766, 770-71 (7th Cir. 1994); In re Chicago, Milwaukee, St. Paul & Pacific R.R., 974 F.2d 775, 782-86 (7th Cir. 1992); Epstein v. Official Comm. of Unsecured Creditors of Estate of Piper Aircraft Corp., 58 F.3d 1573 (11th Cir. 1995); Lemelle v. Universal Mfg. Corp., 18 F.3d 1268, 1274-78 (5th Cir. 1994); In re Jensen, 995 F.2d 925, 930-31 (9th Cir. 1993) (per curiam); In re Chateaugay Corp., supra, 944 F.2d at 1005; Grady v. A.H. Robins Co., 839 F.2d 198 (4th Cir. 1988); contra, Jones v. Chemetron Corp., No. 99-3500, 2000 WL 558986, *5 (3d Cir. May 9, 2000); In re M. Frenville Co., supra, 744 F.2d at 336-37. However, mindful of the problem flagged by our automobile hypotheticals, the courts in these cases have suggested various limiting principles. We needn't go through them, for a reason that will appear in a moment; and anyway we greatly doubt that the issue is one that lends itself to governance by formula. It may not be possible to say anything more precise than that if it is reasonable to do so, bearing in mind the cost and efficacy of notice to potential future claimants and the feasibility of estimating the value of their claims before, perhaps long before, any harm giving rise to a matured tort claim has occurred, the bankruptcy court can bring those claimants into the bankruptcy proceeding and make provision for them in the final decree. This "test," if it can be dignified by such a term, would exclude the automobile hypotheticals; given that so far only one out of every thousand pipes sold by Interpace have burst, this case may be closer to them than to asbestos and Dalkon Shield.

 This we need not decide and anyway could not without knowing how serious the defect in the pipe is; maybe all the pipe that Interpace sold to these 10,000 purchasers is defective and must be replaced long before the end of the normal useful life of such a product. But that, as we say, does not have to be decided. For even if Denver was eligible to file a claim in the Madison bankruptcy before it suffered any harm from the defective pipe, it could not lawfully be penalized for its failure to do so. The notice of the bar date was culpably deficient. A trustee in bankruptcy cannot subordinate late-filed claims, as he did here, if the late filers "did not have notice or actual knowledge of the case in time for timely filing," 11 U.S.C. sec. 726(a)(2)(C)(i), and their claims were filed before the estate had been distributed. sec. 726(a)(2)(C)(ii). If both conditions are met, the late filer is entitled to parity with the other

unsecured creditors. E.g., Cooper v. Internal Revenue, 167 F.3d 857, 858 (4th Cir. 1999); In re Savage Industries, 43 F.3d 714, 721 (1st Cir. 1994).

 The statute says notice or actual knowledge, and let us begin with the former. All the statute says is that the notice must be "appropriate in the particular circumstances," 11 U.S.C. sec. 102(1)(A), but the bankruptcy rules, a little more helpfully, provide that "the court may order notice by publication if it finds that notice by mail is impracticable." Bankr. R. 2002(l). The cases sensibly assume that the general norms of fair notice, as set forth in Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950); Tulsa Professional Collection Services, Inc. v. Pope, 485 U.S. 478, 489-91 (1988); Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 797-800 (1983), and other such cases, apply to bankruptcy as to other settings in which a person's legal right is extinguished if he fails to respond to a pleading. In re Savage Industries, supra, 43 F.3d at 721; In re Auto-Train Corp., 810 F.2d 270, 278 (D.C. Cir. 1987). So even if--which, for the reasons explained in Creek v. Village of Westhaven, 80 F.3d 186, 193 (7th Cir. 1996), we doubt--municipalities (such as Denver) cannot complain about a denial of due process even when it isn't their own state they're complaining about (which they can't do, City of Newark v. New Jersey, 262 U.S. 192, 196 (1923); City of East St. Louis v. Circuit Court for Twentieth Judicial Circuit, 986 F.2d 1142, 1144 (7th Cir. 1993)), they are entitled to the equivalent protections under the notice provisions of the Bankruptcy Code. In re Hairopoulos, 118 F.3d 1240, 1244 n. 3 (8th Cir. 1997); see City of New York v. New York, New Haven & Hartford R.R., 344 U.S. 293, 296-97 (1953).

 Fair or adequate notice has two basic elements: content and delivery. If the notice is unclear, the fact that it was received will not make it adequate. Mullane v. Central Hanover Bank & Trust Co., supra, 339 U.S. at 314, 318; Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV, 209 F.3d 252, 265 (3d Cir. 2000); In re Barton Industries, Inc., 104 F.3d 1241, 1245-46 (10th Cir. 1997); In re Linkous, 990 F.2d 160, 162-63 (4th Cir. 1993); In re Auto-Train Corp., supra, 810 F.2d at 279. That is not a problem here, because the notice did identify Madison as successor to Interpace. But unless received, the notice was inadequate unless the means chosen to deliver it was reasonable. Mullane v. Central Hanover Bank & Trust Co., supra, 339 U.S. at 314, 319; Towers v. City of Chicago, 173 F.3d 619, 628 (7th Cir. 1999); Schluga v. City of Milwaukee, 101 F.3d 60, 62 (7th Cir. 1996).

There are two basic means--the transmission of the notice to the intended recipient and the publication of the notice in a newspaper or magazine or other medium likely (or at least as likely as it is feasible to arrange) to come to the attention of the person entitled to notice. If his name and address are reasonably ascertainable, he is entitled to have that information sent directly to him, but, if not, then publication of the information in the newspaper or other periodical that he's most likely to see is permitted. In re Chicago, Milwaukee, St. Paul & Pacific R.R., supra, 974 F.2d at 788; In re Crystal Oil Co., 158 F.3d 291, 297 (5th Cir. 1998); Chemetron Corp. v. Jones, 72 F.3d 341, 345-47 (3d Cir. 1995); In re Savage Industries, supra, 43 F.3d at 721-22.

The cases refer to creditors in the first class as "known creditors" and creditors in the second class as "unknown creditors," but this is imprecise. The issue is not whether the creditor is known to the trustee but whether the creditor's name and address can be readily ascertained by the trustee, making it feasible to send the creditor the notice directly and not force him to read the fine print in the Wall Street Journal. Apart from the cost of finding the creditor's name and address, the sheer number of potential creditors in relation to the size of their claims may make it excessively costly to provide direct notice to all of them. In re GAC Corp., 681 F.2d 1295, 1300 (11th Cir. 1982). The cost of direct notice in such a case might eat up the debtor's estate, especially when the claims are discounted to reflect their actual value. If the assets of the estate are obviously insufficient to pay more than 10 cents on the dollar, an unsecured claim for $1 million is not worth $1 million, but only $100,000. And if it is a tort claim, a reasonable estimate of its value may be much smaller than the amount claimed, since tort damages, not being liquidated or readily computable in most cases, are typically exaggerated in the complaint.

Notice by publication may thus be entirely appropriate when potential claimants are numerous, unknown, or have small claims (whether nominally or, as we have just pointed out, realistically)--all circumstances that singly or in combination may make the cost of ascertaining the claimants' names and addresses and mailing each one a notice of the bar date and processing the responses consume a disproportionate share of the assets of the debtor's estate. E.g., Mullane v. Central Hanover Bank & Trust Co., supra, 339 U.S. at 317-18; City of New York v. New York, New Haven & Hartford R.R., supra, 344 U.S. at 296; In

re Chicago, Milwaukee, St. Paul & Pacific R.R., supra, 974 F.2d at 788; In re GAC Corp., supra, 681 F.2d at 1300. That isn't this case. This is a multimillion dollar bankruptcy, the potential claimants were all purchasers of a product manufactured by the debtor's predecessor, and Denver in particular was a large purchaser. (We don't know what it paid, but we know that it bought and installed at least five miles of Interpace pipe.) Other pipe claimants had filed multimillion dollar claims. The suggestion that the trustee could not have discovered that Denver had purchased a large quantity of the defective pipe strikes us as risible.

Although Denver did not receive fair notice of the bankruptcy proceeding, may it have had actual knowledge of the proceeding? After all, the proceeding had been pending for years before the bar date. The general rule, moreover, is that the only knowledge required is knowledge of a critical stage of the proceeding from which the bar date can be computed, see, e.g., In re Maya Construction Co., 78 F.3d 1395, 1399 (9th Cir. 1996); In re Medaglia, 52 F.3d 451, 455 (2d Cir. 1995); cf. In re Sam, 894 F.2d 778, 781 (5th Cir. 1990), not of the bar date itself. Normally all that is required in a Chapter 7 proceeding is knowledge of when the petition for bankruptcy was filed, because the statute requires that the bar date be set at 90 days after the first creditors' meeting, which must be held between 20 and 40 days after the petition for bankruptcy is filed. Bankr. R. 2003(a), 3002(c). The cautious creditor who knows only the date of the petition will therefore file his proof of claim within 110 days after that date.

Here, however, the bar date was set at almost 18 months after Madison filed its petition for bankruptcy. The reason is that the initial petition was under Chapter 11, which doesn't have the 90-day rule. Bankr. R. 3003(c)(3); Pioneer Investor Services Co. v. Brunswick Associates Limited Partnership, 507 U.S. 380, 382 (1993). After being converted to a Chapter 7 proceeding on July 17, 1992, a "Notice of Commencement of Case Under Chapter 7" was filed, fixing the bar date 90 days later. Denver was not served with that notice, and there is no indication that it knew about it, which means that Denver would not have known how to compute the bar date--and so was entitled to notice of that date. Cf. In re Chicago, Rock Island & Pacific R.R., 788 F.2d 1280, 1283 (7th Cir. 1986); In re Trans World Airlines, Inc., 96 F.3d 687, 690 (3d Cir. 1996); In re Maya Construction Co., supra, 78 F.3d at 1399; In re Spring Valley Farms, Inc., 863 F.2d 832, 834-35 (11th Cir. 1989); see also In re Unioil, 948 F.2d 678, 683 (10th Cir. 1991); In re

Walker, 927 F.2d 1138, 1145 and n. 11 (10th Cir. 1991); but see In re Christopher, 28 F.3d 512, 517-18 (5th Cir. 1994). It received no notice. Nor is there any reason to believe that it knew Madison had acquired Interpace and therefore was aware that it might have an interest in a Madison bankruptcy. Nor, given the uncertainty whether Denver even had a claim that it could file in a bankruptcy proceeding before the pipes burst, long after the bar date, can Denver be faulted in the absence of notice for not having filed a proof of claim before then.

Had Denver never become a party to the Madison bankruptcy proceeding, the injunction against its prosecuting its own suit against Zell and the others could not have been issued. Enjoining nonparties is not completely out of the question for a bankruptcy court, but it is a stretch. If A has a claim against B, it is easy to see why B would like to have a settlement that resolved not only its dispute with A but its dispute with C as well, and it is easy to see why A would be delighted to agree to such a provision since by making the settlement more valuable to B the provision would enable A to get a larger settlement--this is the reason the district judge gave for approving the settlement. But two parties cannot agree to extinguish the claim of a third party not in privity with either of them-- let alone the potential claims of 10,000 third parties. E.g., Martin v. Wilks, 490 U.S. 755, 761-62 (1989); Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 529 (1986); United States v. Board of Education, 11 F.3d 668, 672-73 (7th Cir. 1993); Lindsey v. Prive Corp., 161 F.3d 886, 891 (5th Cir. 1998).

Like most legal generalizations, this one requires qualification. If C is required to file its claim against A in the litigation between A and B, and fails to do so, the settlement of that litigation can extinguish C's rights. Martin v. Wilks, supra, 490 U.S. at 762 n. 2. That is paradigmatic of bankruptcy--and the defendants' first argument, which we've rejected, for binding Denver to the settlement. In addition, the court can enjoin a third party from interfering with the disposition of the property in the debtor's estate, Fisher v. Apostolou, 155 F.3d 876, 882 (7th Cir. 1998); Zerand-Bernal Group, Inc. v. Cox, 23 F.3d 159, 161-62 (7th Cir. 1994), just as an ordinary injunction can be made to run against third parties who have notice of it, in order to prevent interference with it. And thus when an asset of the estate is sold by the trustee in bankruptcy free and clear of any liens, the court can enjoin a creditor from suing to enforce a preexisting lien in the asset. 11 U.S.C. sec. 363(f); In re Penrod, 50 F.3d 459, 461 (7th Cir.

1995); Zerand-Bernal Group, Inc. v. Cox, supra, 23 F.3d at 163; Gotkin v. Korn, 182 F.2d 380, 382 (D.C. Cir. 1950); In re WBQ Partnership, 189 B.R. 97, 110 (Bankr. E.D. Va. 1995). Madison's trustee and the adversary defendants argue that the trustee "owns" the fraudulent-conveyance claim against those defendants--that it is an asset of the debtor's estate--and that he has "sold" it (by releasing the claim) free and clear to them for whatever amount is necessary to give the timely unsecured creditors 70 cents on the dollar, and that the suit Denver has brought in a state court against them is an interference with that asset. Let us see.

It is true that the trustee "owns" Madison's claim in the loose sense that it's part of the debtor's estate, which the trustee controls. 11 U.S.C. sec. 541(a); Pepper v. Litton, 308 U.S. 295, 307 (1939); Koch Refining v. Farmers Union Central Exchange, Inc., 831 F.2d 1339, 1343-44 (7th Cir. 1987); In re Ionosphere Clubs, Inc., 17 F.3d 600, 604 (2d Cir. 1994). But the issue is Denver's claim, the claim that the adversary defendants looted Madison so that it wouldn't have any assets out of which to pay tort claims arising from the eventual bursting of the defective pipe. Denver's is thus a derivative claim, the primary victim of the fraudulent conveyance being Madison. It was Madison's assets that were conveyed away; Denver suffered only in its capacity as a potential claimant to those assets, assuming Madison was liable for Interpace's torts as Interpace's successor-- though whether Madison would actually have been liable for the torts of its predecessor, Interpace, has not been determined; successor liability is a confused area of the law. Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac, 920 F.2d 1323, 1325 (7th Cir. 1990), quoting EEOC v. Vucitech, 842 F.2d 936, 944 (7th Cir. 1988).
The right to bring a derivative claim, of which the most common type is the shareholder derivative suit, depends on showing that the primary claimant has unjustifiably failed to pursue the claim. E.g., Kamen v. Kemper Financial Services, Inc., 500 U.S. 90, 95-96 (1991); Ross v. Bernhard, 396 U.S. 531, 534 (1970); Stepak v. Addison, 20 F.3d 398, 402 (11th Cir. 1994); Spiegel v. Buntrock, 571 A.2d 767, 777-78 (Del. 1990). But that is this case. The trustee did press the primary claim to settlement, but he did so under the mistaken impression that the settlement would give all deserving creditors 70 cents on the dollar. Had he realized that Denver could not rightly be penalized for having failed to file by the bar date--he was not likely to realize this, of course, since he was responsible for the defective notice--he would no doubt have

pressed Zell and the other defendants to make provision in the settlement for Denver. He did not do so, and therefore was not an adequate representative of Denver's legitimate interests, Denver being as entitled as any of the other pipe claimants to a share of any settlement.

If a trustee unjustifiably refuses a demand to bring an action to enforce a colorable claim of a creditor, the creditor may obtain the permission of the bankruptcy court to bring the action in place of, and in the name of, the trustee. In re Perkins, 902 F.2d 1254, 1258 (7th Cir. 1990); In re Gibson Group, Inc., 66 F.3d 1436, 1445-46 (6th Cir. 1995); Louisiana World Exposition v. Federal Ins. Co., 858 F.2d 233, 247 (5th Cir. 1988); In re STN Enterprises, 779 F.2d 901, 904 (2d Cir. 1985); In re Automated Business Systems, Inc., 642 F.2d 200, 201 (6th Cir. 1981). In such a suit, the creditor corresponds to the shareholder, and the trustee to management, in a shareholder derivative action. Cf. Parnes v. Bally Entertainment Corp., 722 A.2d 1243, 1245 (Del. 1999); Kramer v. Western Pacific Industries, Inc., 546 A.2d 348, 351 (Del. 1988).

It makes no difference that the trustee probably owned Denver's derivative claim as well as the direct claim (Madison's claim as the immediate victim of the looting of its assets by the adversary defendants). Murray v. Miner, 876 F. Supp. 512, 516-17 (S.D.N.Y. 1995), aff'd, 74 F.3d 402 (2d Cir. 1996), points out that Delaware permits a subsidiary to sue its parent (the subsidiary's controlling shareholder) on the complaint of the subsidiary's minority shareholder that the parent is looting the subsidiary, and Madison corresponds to that subsidiary and Denver to the shareholder. Madison is a Delaware corporation, and under standard choice of law rules that we may assume applicable here despite persisting uncertainty as to whether state or federal law supplies the choice of law rules in a bankruptcy case, see In re Morris, 30 F.3d 1578, 1581-82 (7th Cir. 1994); In re Stoecker, 5 F.3d 1022, 1028-29 (7th Cir. 1993), the law of the state of incorporation determines who can bring a derivative suit, Stromberg Metal Works, Inc. v. Press Mechanical, Inc., 77 F.3d 928, 933 (7th Cir. 1996); Restatement (Second) of Conflict of Laws sec. 307 (1971), and so implies that the trustee owns Denver's claim after all.

No matter. The trustee "owns" the claims of the unsecured creditors only in the sense that he controls their prosecution. He is not the beneficial owner, but rather is the fiduciary of the creditors, including Denver. CFTC v. Weintraub, 471 U.S. 343, 354-55 (1985); In re Salzer, 52 F.3d 708, 712 (7th Cir. 1995); In re

Martin, 91 F.3d 389, 394 (3d Cir. 1996). One of his fiduciary duties is to honor the relative priorities of the unsecured creditors. Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 441 (1968); In re American Reserve Corp., 841 F.2d 159, 162 (7th Cir. 1987); In re Cajun Electric Power Co-op., Inc., 119 F.3d 349, 355 (5th Cir. 1997). If he fails to do so, the creditor can proceed in his place and in his name. Not having received the notice to which it was entitled, Denver had the right to file a late claim and participate in the estate equally with the other unsecured creditors. 11 U.S.C. sec. 726(a)(2). Approving a settlement that subordinated Denver's claim was therefore an abuse of the district court's discretion and so cannot stand. E.g., Depoister v. Mary M. Holloway Foundation, 36 F.3d 582, 586-87 (7th Cir. 1994); Jeffrey v. Desmond, 70 F.3d 183, 185 (1st Cir. 1995). Nor can the injunction, which is premised on the settlement.

What next? This bankruptcy proceeding is almost a decade old, and we hope that on remand it can be moved to an early conclusion. If the adversary defendants are willing to sweeten the pot to the extent necessary to induce Denver to drop its claims (including its state-court suit), and to take their chances with regard to any other nonparty pipe claimants who may crop up later and want to sue them, the case can still be resolved by settlement--and the state-court suit enjoined. The vice of the present injunction is not that it was entered against a nonparty but that it was premised on an invalid settlement. Denver became a party to the bankruptcy proceeding when it filed its proof of claim in 1998, and though we cannot find a case on point, we think it a sensible extension of cases like Zerand-Bernal Group, Inc. v. Cox, supra, that as a party to the bankruptcy proceeding Denver could be enjoined from prosecuting in any other forum the claim that it had filed in that proceeding. It was stymied from prosecuting its claim in the bankruptcy proceeding by the settlement that must now be vacated. With the settlement out of the way, it is free to proceed by demanding that the trustee prosecute its claim. If he unreasonably refuses, Denver can prosecute the claim itself, in conformity with the procedure set forth in In re Perkins, supra. If the trustee agrees to prosecute the claim and negotiates a new settlement that makes provision for Denver, then Denver can if dissatisfied ask the district court to reject the new settlement in the exercise of the court's discretion to reject an unreasonable settlement. E.g., Depoister v. Mary M. Holloway Foundation, supra, 36 F.3d at 585-86; Jeremiah v. Richardson, 148 F.3d 17, 23 (1st Cir. 1998).

Reversed.