[No. 78774-3.   En Banc.]
Argued May 17, 2007.   Decided August 9, 2007.

EDWIN HERRING, *Individually and as Personal Representative, Respondent*, v. TEXACO, INC., ET AL., *Defendants*, TODD SHIPYARDS CORPORATION, *Petitioner*.

*Walter E. Barton* (of *Karr Tuttle Campbell*) and *Philip A. Talmadge* (of *Talmadge Law Group, PLLC*), for petitioner.

*Janet L. Rice* and *William J. Rutzick* (of *Schroeter Goldmark & Bender*), for respondent.

¶1 CHAMBERS, J. — During the 1960s and early 1970s, Roger Herring, a member of the Asbestos Workers Union Local 7, worked for subcontractors of Todd Shipyards at Todd's work sites. Herring's asbestos exposure ultimately caused fatal mesothelioma. Before Herring died, he sued Todd.

¶2 In the years between the time Herring was exposed to asbestos and when he developed mesothelioma, Todd declared bankruptcy. The main issue for our review is whether Todd's bankruptcy discharged Herring's claim. Specifically, Herring argues that Todd should have given actual notice of its bankruptcy to Herring's union. We conclude that under controlling federal law, Todd had no obligation to give actual notice of the bankruptcy to Herring's union. We accordingly reverse the Court of Appeals and reinstate the trial court's dismissal.

I

¶3 This is a tragic case. After working with asbestos for at least 20 years, Herring was diagnosed with pleural thickening in 1986. Three years later, he developed asbestosis, a scarring of his lungs. In 1989, Herring sued

several manufacturers of asbestos-containing products. Todd was not among the defendants.

¶4 In 1987, after Herring's diagnosis, Todd filed a voluntary petition for chapter 11 reorganization in the United States Bankruptcy Court for the District of New Jersey. At the time, Todd likely knew it was at risk for asbestos-related claims. At least Todd knew about several asbestos-related employee claims that had been filed against it in New Orleans. The bankruptcy court issued a bar claims date for filing proofs of claims in 1988.[1] As a precondition to the court ordering a discharge of all potential claims, Todd sent written notice of its bankruptcy to all known creditors, stockholders, and noteholders. According to Michael Marsh, in-house counsel for Todd,

> Todd made diligent efforts to identify and notify potential creditors of its bankruptcy. Such efforts included notifying individuals on its accounts receivable and accounts payable registers, notifying everyone who conducted business with Todd, and notifying all unions representing Todd's employees. In addition, I recall that Todd Shipyards identified its subcontractors as entities to whom it would send actual notice.

Clerk's Papers (CP) at 48. Todd did not give actual notice to the unions of its subcontractors,[2] but it did publish notice of the bankruptcy and the bar date in several newspapers, including *The Seattle Times*, *Seattle Post-Intelligencer*, and the national editions of *The New York Times* and *The Wall Street Journal*. Todd emerged from bankruptcy in 1989.

¶5 In 2002, Herring was diagnosed with mesothelioma, which ultimately caused his death two years later. He filed a lawsuit based on that diagnosis, and his estate is continu-

---

[1] The bar claims date is the last day claims may be filed against a bankruptcy debtor. *Chemetron Corp. v. Jones*, 72 F.3d 341, 344-45 (3d Cir. 1995).

[2] Marsh originally asserted that Todd notified "all unions whose members had worked at Todd Shipyards," which would have included Herring's union. CP at 456. Later, Marsh clarified his statement: Todd only notified "all unions representing Todd's employees." CP at 48. The Court of Appeals found that these unions had collective bargaining agreements with Todd and were known creditors, though we have not found that reflected in the record provided to us. *Herring v. Texaco, Inc.*, 132 Wn. App. 479, 484, 132 P.3d 1102 (2006).

ing this suit. Sometime after Herring's suit was filed, Todd was added as a defendant. Todd was unaware of Herring and his claims until about that time.

¶6 Neither Herring nor his union has received actual notice of Todd's bankruptcy. Officers of Herring's union have submitted declarations asserting that if they had received notice, they would have passed it on to their members.[3] It appears that the union itself was not one of Todd's creditors.

¶7 In March 2004, Todd successfully moved for summary judgment on the ground that Herring's claims had been discharged in the earlier bankruptcy. The Court of Appeals reversed, holding due process required Todd to give actual notice of its bankruptcy to Herring's union before Herring's claims could have been discharged. *Herring v. Texaco, Inc.*, 132 Wn. App. 479, 132 P.3d 1102 (2006). The divided Court of Appeals below found that it was "reasonably ascertainable" that Todd would be liable to Asbestos Workers Union members who worked on its site for asbestos-related claims, since it knew that similar claims against it were escalating, and concluded that the bankruptcy did not discharge Herring's claim. *Id.* at 486. We accepted review, *Herring v. Texaco, Inc.*, 159 Wn.2d 1004, 153 P.3d 196, and now reverse.

## II

¶8 We review summary judgment de novo, taking all facts in the light most favorable to the nonmoving party. *See Reynolds v. Hicks*, 134 Wn.2d 491, 495, 951 P.2d 761 (1998). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See id.*; CR 56(c).

---

[3] Herring submitted a declaration from the union's former business manager. He declared that "[i]t is my belief that had the union been notified of the Todd Shipyards bankruptcy, it would have notified its members by publication and/or during union meetings, which to my knowledge, was never done." CP at 590.

## III

■ ¶9 State courts have concurrent jurisdiction with federal bankruptcy courts over dischargeability issues, with exceptions not relevant today.[4] *See In re Carter*, 38 B.R. 636, 638 n.5 (Bankr. D. Conn. 1984). While state courts lack the power to modify or dissolve an order, we do have the power to determine its applicability when discharge is raised as a defense to a state cause of action filed in state court. *In re Pavelich*, 229 B.R. 777, 783 (B.A.P. 9th Cir. 1999) (holding that "state courts have the power to construe the discharge and determine whether a particular debt is or is not within the discharge"); *McGhan v. Rutz*, 288 F.3d 1172, 1180 (9th Cir. 2002) (holding that a state court exceeded its jurisdiction only when it considered a challenge to a bankruptcy court order after it appropriately determined that the party's claim was discharged by the bankruptcy court). Here, Herring is not challenging the bankruptcy court's discharge order; he is asking us to determine if it applies. We have that power.

## IV

■ ¶10 Todd argues, as it did to the superior court, that the 1988 bar date order issued by the bankruptcy court simply precludes Herring's current claim on its face. Herring asks that we not review this issue since Todd did not present it to the Court of Appeals. *See Peoples Nat'l Bank of Wash. v. Peterson*, 82 Wn.2d 822, 830, 514 P.2d 159 (1973). But this issue implicates comity and proper respect for the federal courts. If the bar date order has preclusive effect, it would call into question the "right to maintain the action," which implicates an exception to the general rule that this

---

[4] The exceptions to this concurrent jurisdiction for questions of dischargeability involve fraud or a false financial statement, 11 U.S.C. § 523(a)(2), fraud by a fiduciary, embezzlement, or larceny, 11 U.S.C. § 523(a)(4), and willful and malicious injury, 11 U.S.C. § 523(a)(6).

court will decline to review arguments abandoned below. *Id.* at 830. We have decided to reach this issue.

■■ ¶11 It is the debtor's responsibility, not the bankruptcy court's, to identify, list, and notify creditors. *Maya Constr. Co. v. Maya Constr.*, 78 F.3d 1395, 1399 (9th Cir. 1996); *Savage Indus., Inc. v. Savage Arms, Inc.*, 43 F.3d 714, 720 (1st Cir. 1994). The bar date order would discharge Herring's claim only if he received whatever notice of Todd's bankruptcy he was entitled to, either actual notice as a known creditor or publication notice as an unknown one. *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995) ("Inadequate notice is a defect which precludes discharge of a claim in bankruptcy."). Due process requires (among other things) adequate notice before rights can be extinguished. *Reliable Elec. Co. v. Olson Constr. Co.*, 726 F.2d 620, 623 (10th Cir. 1984) ("[T]he discharge of a claim without reasonable notice of the confirmation hearing is violative of the fifth amendment to the United States Constitution."). If Herring was a known creditor and did not receive actual notice, the 1988 bar date order does not preclude his claim. We must determine if he was a known creditor or if some other principle of law prevents the bankruptcy bar from applying to him.

V

■ ¶12 We turn now to the most difficult issue in this case: whether Herring was entitled to more notice of the bankruptcy than he got before his claim could be barred. Again, due process requires adequate notice and opportunity to comment before a court can extinguish a future claim. *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 316-17, 70 S. Ct. 652, 94 L. Ed. 865 (1950). Herring's claimant status is somewhat unusual. Generally speaking, Herring's claim is a particularized personal injury claim. Ordinarily, a personal injury is not a "claim" until it accrues. *Cf. Fogel v. Zell*, 221 F.3d 955, 960 (7th Cir. 2000) ("A claim implies a legal right, however, and before a

tort occurs the potential victim has no legal right."); *M. Frenville Co. v. M. Frenville Co.*, 744 F.2d 332, 335 (3d Cir. 1984) ("Only proceedings that could have been commenced or claims that arose before the filing of the bankruptcy petitions are automatically stayed."). All of the elements of a personal injury must occur before the claim accrues, including damages and, often, reasonable awareness of those damages. *E.g., Hamilton v. Asbestos Corp.*, 22 Cal. 4th 1127, 1137, 998 P.2d 403, 95 Cal. Rptr. 2d 701 (2000); *cf. C.J.C. v. Corp. of Catholic Bishop of Yakima*, 138 Wn.2d 699, 707, 985 P.2d 262 (1999); *see also* Frederick Tung, *Taking Future Claims Seriously: Future Claims and Successor Liability in Bankruptcy,* 49 Case W. Res. L. Rev. 435, 466-78 (1999) (discussing different courts' treatment of future claims in bankruptcies).

¶13 It is undisputed that because Herring was diagnosed with pleural thickening in 1986, his claim against Todd accrued before the bankruptcy bar date and was potentially dischargeable. 11 U.S.C. §§ 101(5)(A), 1141(d)(1)(A)(i). While it is not before us, we note that at least in some jurisdictions, victims of asbestos-related disease are allowed to bring successive suits against different defendants for different injuries caused by the same asbestos exposure. *See, e.g., Hamilton*, 22 Cal. 4th at 1137; *Pustejovsky v. Rapid-Am. Corp.*, 35 S.W.3d 643, 653 (Tex. 2000).[5] Tort law likely would have allowed Herring to bring this suit against Todd. The question before us is whether bankruptcy law bars it.

---

[5] [A] person who sues on or settles a claim for a non-malignant asbestos-related disease with one defendant is not precluded from a subsequent action against another defendant for a distinct malignant asbestos-related condition. The diagnosis of a malignant asbestos-related condition creates a new cause of action, and the statute of limitations governing the malignant asbestos-related condition begins when a plaintiff's symptoms manifest themselves to a degree or for a duration that would put a reasonable person on notice that he or she suffers from some injury and he or she knows, or with reasonable diligence should know, that the malignant asbestos-related condition is likely work-related.

*Pustejovsky*, 35 S.W.3d at 653.

¶14 A large body of law has developed concerning the adequacy of notice for due process in the bankruptcy context. "Inadequate notice is a defect which precludes discharge of a claim in bankruptcy. Due process requires notice that is 'reasonably calculated to reach all interested parties, reasonably conveys all the required information, and permits a reasonable time for a response.' " *Chemetron*, 72 F.3d at 346 (quoting *Eagle Bus Mfg., Inc. v. Rogers*, 62 F.3d 730, 735 (5th Cir. 1995)). Whether notice was adequate is determined from the totality of the circumstances. *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 484, 108 S. Ct. 1340, 99 L. Ed. 2d 565 (1988).

¶15 In bankruptcy actions, whether notice was reasonably calculated to notify a potential creditor turns on whether the potential creditor was known or unknown. *Fogel*, 221 F.3d at 963. Known creditors are those whose identities are reasonably ascertainable through a reasonably diligent search by the debtor. *Id.; see also Tulsa*, 485 U.S. at 490; *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 n.4, 800, 103 S. Ct. 2706, 77 L. Ed. 2d 180 (1983). Under well established federal case law, known creditors are entitled to actual notice before their claims are discharged. *City of New York v. N.Y., New Haven & Hartford R.R.*, 344 U.S. 293, 296, 73 S. Ct. 299, 97 L. Ed. 333 (1953). Unknown creditors, however, may have their claims discharged in the bankruptcy even if they only "received" publication notice. *Chemetron*, 72 F.3d at 356; *see also Tulsa*, 485 U.S. at 489.

¶16 We turn now to whether Herring (or his union) was a known creditor. Creditors are considered reasonably ascertainable if the debtor has "some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom he would be liable." *La. Dep't of Envt'l Quality v. Crystal Oil Co.*, 158 F.3d 291, 297 (5th Cir. 1998). The creditor must be identifiable through "reasonably diligent efforts." *Mennonite Bd. of Missions*, 462 U.S. at 798 n.4. Diligence does not require "impracticable and extended searches . . . in the name of due process." *Mullane*, 339 U.S. at 317-18.

¶17 Courts look primarily to the debtor's own books to determine which creditors were "reasonably ascertainable" and thus, as a matter of law, known. This approach comes from a nonbankruptcy case involving the notice due to beneficiaries of a trust before a judicial settlement could be made. *See Mullane*, 339 U.S. at 317. *Mullane* has since been appropriated into bankruptcy law. *Chemetron*, 72 F.3d at 346 n.1.

¶18 Business records are kept for business purposes and serve well as a basis for determining whether claims are "reasonably ascertainable" for claims based upon contracts and sales. However, sometimes more is required. Notice must be calculated to give notice to all interested parties, and claims based on industrial, toxic, or similar environmental harms may not be ascertainable by any examination of the debtor's books. *Id.* at 346-47. There is legitimate concern that tort victims of oil spills, ground water contamination, or dangerous and defective products put in the stream of commerce would not be readily ascertainable by the examination of a company's books, even if the company knows full well that there is a well defined class of victims with cognizable claims and when the fear of these claims precipitated the decision to seek bankruptcy protection. Notice based solely upon reference to the bankrupt's books might not satisfy fundamental notions of due process in such mass tort contexts. However, that is not the case before us today.

¶19 It is undisputed that Todd did not possess any specific information about Herring in its own books. Herring argues that a reasonably diligent effort by Todd to identify known creditors would have included notifying his union. Todd knew that asbestos related claims had been filed against it and must have known that the Asbestos Workers Union represented individuals who worked with asbestos at Todd's work sites and might have future claims against it as a result. *See, e.g., Kelley v. Howard S. Wright Constr. Co.*, 90 Wn.2d 323, 332-33, 582 P.2d 500 (1978) (duty to provide a safe workplace for subcontractor's employees).

To establish that it had made diligent efforts to identify and notify all potential creditors of its bankruptcy, its in-house counsel had declared that it had notified all unions representing Todd's employees and all subcontractors.

¶20 Todd responds that because it had no knowledge of Herring's claim, it had no obligation to send him or his union actual notice. But courts have required debtors to go beyond their own books to determine whether a claim is reasonably ascertainable. In *Fogel*, Judge Posner, writing for the Seventh Circuit Court of Appeals, held that the city of Denver was entitled to actual notice of a debtor's bankruptcy when it purchased a large quantity of defective piping from the debtor even though the piping had not failed at the time of bankruptcy. *Fogel*, 221 F.3d at 963. Because "[o]ther pipe claimants had filed multimillion dollar claims," the court stated that the "suggestion that the trustee could not have discovered that Denver had purchased a large quantity of the defective pipe strikes us as risible." *Id.* Similarly, our Court of Appeals reasoned that "[a]s in *Fogel*, there was no reason the trustee would not have been aware of the [other asbestos related] claims and the union whose members were likely to have them." *Herring*, 132 Wn. App. at 490.

¶21 *Fogel* is not directly on point. As a direct (and major) purchaser, the city of Denver's *identity* was undoubtedly readily ascertainable from the debtor's own books and records. *Fogel*, 221 F.3d at 963. Indeed, the city of Denver purchased $18 million of the failing pipe. While in both Herring's case and in *Fogel,* the *claim* may have been reasonably ascertainable, the most meticulous search by Todd would not have revealed Herring's *identity*. However, we do agree that *Fogel* supports the general principle that, depending upon the circumstances, a debtor must do more than merely examine its own records in order to determine known creditors. *Cf. Chemetron*, 72 F.3d at 347 n.2 ("Situations may arise when creditors are 'reasonably ascertainable,' although not identifiable through the debtor's books and records." (citing *Tulsa*, 485 U.S. at 491)). In

the related context of foreclosure, the First Circuit Court of Appeals required the government to do more than simply examine its own books. *See United States v. One Star Class Sloop Sailboat*, 458 F.3d 16 (1st Cir. 2006).

¶22 But here, Herring asks us to go far beyond *Fogel*. Another asbestos case is more directly in point. In *In re Chicago, Rock Island & Pacific Railroad,* 90 B.R. 329, 330 (N.D. Ill. 1987), a bankrupt railroad's alleged negligence led to a former employee developing an asbestos-related disease. The former employee filed his claim seven months after the bar date, but argued his claim was not time-barred because he did not receive actual notice of the bankruptcy. *Id.* Like this case, the railroad knew that its employees were exposed to asbestos and thus claims were foreseeable. *Id.* at 330-31. But the court found that the determinative question was whether the railroad had any information in its possession that the specific former employee had a claim: "[P]laintiffs argue that the Rock Island knew that its employees had suffered asbestos exposure and therefore that the Rock Island knew of their *potential claims*. However, the court does not find, in the absence of any indication that a *particular claim would ensue*, that plaintiffs can be classified as potential creditors." *Id.* (emphasis added).

¶23 While we recognize that sometimes more than a mere examination of the debtor's books is required, we find that this case is controlled by *Chemetron*, not *Fogel*. In *Chemetron*, the debtor, Chemetron, had left radioactive depleted uranium at a landfill. *Chemetron*, 72 F.3d at 344. After eight years of cleanup supervised by the Nuclear Regulatory Commission, Chemetron filed for bankruptcy. *Id.* Some years after the bankruptcy, a group of former residents of the neighborhood near the landfill and their guests brought suit. They claimed that the bankruptcy did not bar their claim because Chemetron could have foreseen that those living and visiting nearby the radioactive landfill might suffer future harms and should have sent notice to homeowners who lived in the neighborhood and thus who

might have been exposed. *Id.* The trial court agreed. *Id.* at 347. The Third Circuit Court of Appeals reversed, finding that the " 'reasonably foreseeable' " approach was inconsistent with bankruptcy law and would "place an impossible burden on debtors." *Id.* The court concluded that debtors "cannot be required to provide actual notice to anyone who potentially could have been affected by their actions; such a requirement would completely vitiate the important goal of prompt and effectual administration and settlement of debtors' estates." *Id.* at 348.

¶24 We are not without sympathy to Herring's argument that diligence required notice to his union. Unlike *Chemetron*, Todd would not be faced with a great burden by simply notifying the unions of employees who worked at its jobsites with hazardous materials. The touchstone of due process notice is reasonableness. *See generally Mullane*, 339 U.S. at 315-17.[6] Reasonableness is determined from the totality of the circumstances. *Tulsa*, 485 U.S. at 484. Where the bankrupt knows of a large class of claimants, which will not be disclosed in its books, due process and diligence requires reasonable notice to those claimants.

¶25 However, because it is undisputed that Todd did not have knowledge of Herring's claim, Todd could not have given actual notice to Herring. Herring argues that notice should have been given to his union. It certainly would have been desirable for the bankruptcy court to have required such notice or for Todd to have taken the extra step and given notice to Herring's union. But, under current federal case law, it appears to us that Todd had no duty to inform Herring's union. It was not any sort of creditor. Nor do we

---

[6]
But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected or, where conditions do not reasonably permit such notice, that the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes.

*Mullane*, 339 U.S. at 315 (citations omitted).

find support for the theory that notice to Herring's union would have acted as a constitutionally sufficient conduit to provide notice to Herring if he was in fact a known creditor. The record reflects that the most the union would have done would have been to publish notice of Todd's bankruptcy in union publications or at union meetings. The union would, at best, have provided publication notice to Herring. Notice to Herring's union would not have been actual notice to Herring, nor would such notice satisfy due process had Herring been a known creditor.

¶26 It is true that courts have required more of a company than merely examining its own books and records. However, Herring was unknown to Todd, and notice to the union would not be actual notice to Herring. *Chemetron* and *In re Chicago* control. We conclude that Herring was entitled to only notice by publication. Accordingly, we reverse the Court of Appeals and remand to the trial court for further proceedings consistent with this opinion.

ALEXANDER, C.J., and C. JOHNSON, MADSEN, SANDERS, BRIDGE, OWENS, FAIRHURST, and J.M. JOHNSON, JJ., concur.