IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-30423
_____

In The Matter Of:  CRYSTAL OIL COMPANY,

                                                    Debtor.

------------------------------------------

LOUISIANA DEPARTMENT OF ENVIRONMENTAL
QUALITY; OLIN CORPORATION,

                                                    Appellants,

                          versus

CRYSTAL OIL COMPANY,

                                                    Appellee.
_____

Appeals from the United States District Court for the
Western District of Louisiana
_____
October 20, 1998
Before POLITZ, Chief Judge, REAVLEY, and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This bankruptcy appeal arises from a decision that the environmental damage claims of the Louisiana Department of Environmental Quality ("LDEQ") against Crystal Oil Company ("Crystal") were discharged by LDEQ's failure to bring its claim prior to the bar date established in the bankruptcy proceeding. For the reasons set forth below, we find no error on the part of the district court.

From 1926 to 1965, Crystal Oil Refining Corporation ("CORC") owned a plot of land known as the "Shoreline site." CORC transferred a parcel of land, including the Shoreline site, to Olin Mathieson Chemical Corporation in 1965. At that point, CORC transferred all land records associated with the Shoreline site. In 1966, CORC merged into Roberts Company. Roberts Company personnel assumed management responsibilities for the new company, which was renamed Crystal Oil Company, the appellee in this case.

On February 25, 1986, LDEQ received a citizen complaint about the Shoreline site. An employee working for the emergency response team of LDEQ investigated the site. He discovered oil oozing out of the ground, tanks above ground with problems, and gathering lines with problems. He also noticed a rusted sign bearing "Crystal Oil Company" at the edge of the site. The employee made an initial investigation and sent a report to the abandoned and inactive site division of LDEQ.

What followed is what can only be described as a profoundly problematical conversation for the parties concerned--LDEQ and Crystal. In May 1986, Nathan Clements of the abandoned and inactive site division of LDEQ made a phone call to Crystal and spoke with Pat Eddings, the security/environmental compliance officer. Eddings subsequently sent a memorandum summarizing the conversation to Caskey, Crystal's corporate secretary:

> Records indicate that a Crystal Oil Company owned the property in the 1930's and a Mr. C.M. Leonard (ph) was president until 1937. He purchased the property as an individual and operated it as the Leonard Company until they took bankruptcy. The property may have reverted back to Crystal. Ownership, after that, is unknown. It is now owned by the Mandeville or Manville Corporation. Mr. Clements request [sic] to know if it was our "Crystal Oil Company". If so, did Crystal build or purchase the original refinery. If so when? What was refined? Where and to whom did we sell it? Did we later regain control and operations?
> . . . .
> You may want to use caution in releasing any information as there could be environmental problems.

D.EXH.90. Eddings received a response from Caskey, who concluded that, based on a search of in-house records, Crystal had not owned the land. Eddings did not respond to Clements until Clements initiated further contact.

When Clements called again, Eddings agreed to send a letter responding to Clements questions. On October 22, 1986, after another round of deliberation with Caskey, Eddings sent the following letter, which is Crystal's final and only written response to LDEQ's inquiry:

> At the request of Mr. Nathan Clements a research was made of available records now in possession of Crystal Oil Company relative to Shoreline Refinery that operated at one time in North Louisiana, Caddo Parish.

3

> Please be advised that no information was found indicating this company ever owned or operated such a facility.

Trial EXH D-92.

It is worth reflecting for a moment on the nature of the communication between LDEQ and Crystal. From the information available, it is apparent that LDEQ knew that there was a significant environmental problem that could result in liability to previous owners of the land. LDEQ also knew, from performing a title search, that the land had been owned by CORC. Finally, LDEQ suspected that Crystal was CORC's successor corporation. However, because multiple Crystal Oil companies existed, it could not be certain. For whatever reason, Clements did not inform Eddings of the environmental problem. Instead, Clements asked a series of questions designed to elicit the one missing piece of information Clements needed, that Crystal was the successor corporation.

Eddings, on the other hand, we can assume to be well aware that his company was in fact the successor to CORC. As Eddings's memorandum to Caskey makes clear, he was also aware that a call from LDEQ raised the possibility that Crystal could be liable for environmental problems on the land. What Eddings did not know was whether Crystal actually was the company that owned the Shoreline site. Thus, in his own guarded manner, Eddings ultimately responded to the query by answering that, after a search of available records, he had no information to indicate that Crystal

4

owned the Shoreline site. At the end of this round of communication, neither party had obtained any useful information. Eddings did not have any sense of the what, if any, liability Crystal could be subject to if it owned the Shoreline site. Clements, on the other hand, still had not obtained the crucial piece of information he was seeking--whether Crystal was the successor company to CORC.

Crystal incorrectly concluded that it did not own the site because the relevant documents were in off-site storage and were not searched. On appeal, the appellants, LDEQ and Olin ("LDEQ, *et al.*"), do not contend that Crystal acted in bad faith in responding to Clements's query. Indeed, given the clear potential for an adversarial relationship between the parties, Crystal's reply to this opening salvo is a diligent response to LDEQ's query. There was no effort to follow up by LDEQ. Indeed, Crystal did not hear from LDEQ again on this matter for over nine years. In January of 1996, however, Crystal received a letter informing it that it was a potentially responsible party for remediation of the Shoreline site.

But other events had occurred in the nine-year interim. On October 1, 1986, Crystal had filed for Chapter 11 relief in the United States Bankruptcy Court for the Western District of Louisiana. The bankruptcy court set the claims bar date for

5

October 31, 1986.  Crystal published a notice of its bankruptcy in the national edition of <u>The Wall Street Journal</u> and mailed notice of the claims bar date to hundreds of known creditors, including the Louisiana State Department of Conservation, a sister agency of LDEQ.  On December 31, 1986, the bankruptcy court entered an order confirming Crystal's reorganization plan.

Crystal did not list LDEQ as a creditor on its bankruptcy schedules or send LDEQ notice of the claims bar date.  It is disputed whether Crystal's environmental compliance department informed LDEQ officials of its bankruptcy during discussions about ownership.

Environmental response activities at the Shoreline site were transferred to the United States Environmental Protection Agency (the "EPA") in early 1988.  The site was then transferred back to LDEQ in November 1990.  Because the EPA had secured the site and LDEQ's resources were limited, LDEQ deferred action on the site until 1996.  At that time, an inspection of the Shoreline site revealed the following:

> The site is an approximate 50 acre tract which housed an abandoned oil refinery and which now appears as a waste/sludge field, portions of which have been characterized as a hazardous substance due to corrosivity . . . . The property consists of acres of contaminated soil with evidence that groundwater is contaminated.  The site also contains piles of refinery sludge placed in an unlined surface impoundment at the site.  The sludge is refinery unit sludge which is common to refineries such as the one Crystal allowed to be

6

operated on its property and is a recognized waste in the
process of petroleum production refining.

R. 799-800.

On April 19, 1996, Crystal filed a motion to reopen its
bankruptcy case, seeking to enforce the confirmation order against
LDEQ by asserting that any claims of LDEQ had been discharged.
Olin Corporation ("Olin") intervened in support of LDEQ because it
was also listed as a potentially responsible party for the
Shoreline site and wanted to preserve any contribution claims
against Crystal. After a two-day hearing, the bankruptcy court
held that the claims arose before confirmation and were
dischargeable, denying LDEQ's request to file late claims. On
February 28, 1997, the United States District Court consolidated
LDEQ's appeal and Olin's appeal into one proceeding. The district
court affirmed the bankruptcy court. LDEQ and Olin timely
appealed. The EPA and the Louisiana Department of Transportation
and Development filed amicus curiae briefs on behalf of LDEQ,
raising substantially the same arguments as LDEQ and Olin.

II

On appeal, LDEQ, *et al.,* raise three issues. First, they
argue that the bankruptcy and district courts erred in concluding
that a pre-petition bankruptcy claim existed. The bankruptcy court
held that the liability for the Shoreline site constituted a
"claim" within the meaning of the Bankruptcy Code. 11 U.S.C.

7

§ 101(5).  Using the "fair contemplation" test set forth in <u>In re</u> <u>National Gypsum Co.</u>, 139 B.R. 397 (N.D. Tex. 1992) (Sanders, J.), the court concluded that LDEQ's claim arose before confirmation of the plan because LDEQ knew at the time of the bankruptcy filing that Crystal was a former owner of the contaminated site, making the claim dischargeable.  LDEQ, *et al.,* contend that the courts misapplied this test, and no "claim" existed at the time of bankruptcy.

Second, LDEQ, *et al.,* argue that the bankruptcy and district courts erred in holding that LDEQ was given adequate notice. The bankruptcy court found that LDEQ was not a known claimant and, thus, received adequate constructive notice of the bankruptcy. LDEQ, *et al.,* contend that this finding was error because LDEQ was a known claimant and due process dictates that actual notice was required.

The third and final argument made by LDEQ, *et al.,* is that the bankruptcy and district courts erred in holding that the nine-year delay in filing a claim did not qualify as "excusable neglect." LDEQ, *et al.* argue that, by considering the requisite factors of prejudice to the debtor, the circumstances of this case amount to excusable neglect, entitling LDEQ to file a late claim.

III

The first question we address is whether LDEQ's environmental liability claim against Crystal arose prior to the confirmation of Crystal's reorganization plan for bankruptcy purposes. We have considered the various standards that have been suggested for the analysis of this question, and are persuaded that the analysis set forth in the Seventh Circuit's decision in In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 974 F.2d 775 (7th Cir. 1992) ("Chicago I"), is correct. That case discusses most of the relevant cases in this highly specialized area of the law,[1] and synthesizes them to a rational and coherent rule. Under the test ultimately employed by the court in Chicago I, a regulatory environmental claim will be held to arise when "a potential . . . claimant can tie the bankruptcy debtor to a known release of a hazardous substance." 974 F.2d at 786. In this case, then, the question is whether, at the time of bankruptcy, LDEQ could have ascertained through the exercise of reasonable diligence that it

---

[1]Note that the Fifth Circuit has never issued an opinion in this precise area, and, at least as to the issues in this case, has not adopted either the somewhat elaborate rule of In re National Gypsum, 139 B.R. 397 (N.D. Tex. 1992), nor the blunt standard of In re Chateaugay Corp., 944 F.2d 997 (2d Cir. 1991). Although this conclusion is contrary to the intimations of some of the briefs and the determination of the bankruptcy court, it is well supported by a close reading of Judge King's opinion in Lemelle v. Universal Mfg. Co., 18 F.3d 1268 (5th Cir. 1994), the source of the purported adoption. That case did not involve environmental regulatory claims at all, and only looked to National Gypsum and Chateaugay for first principles.

9

had a claim against Crystal for a hazardous release at the Shoreline site.

We agree with the bankruptcy court that LDEQ became aware of the hazardous release in question before the close of Crystal's bankruptcy case. LDEQ, *et al.,* present two arguments to the contrary. First, they contend that LDEQ did not have actual knowledge of a hazardous substance. Second, they contend that, even if LDEQ had known of such a substance, LDEQ could not have tied Crystal to its release. We shall address each argument in turn.

LDEQ, *et al.,* contend that although LDEQ had found oil oozing out of the ground at the Shoreline site, they had not found a hazardous substance, as that term is defined in state and federal definitions of the word. 42 U.S.C. § 9601(14); LSA-R.S. 30:2272(4)(c)(Supp. 1996) formerly LSA-R.S. 20:1149.42(4)(c)(Supp. 1976 to 1986). However, although state and federal definitions exclude "crude oil" from the definitions of hazardous substances, they do not exclude waste oil. As the description of the environmental problems with the Shoreline site, <u>supra</u> Part I, makes clear, it is <u>waste</u> oil that makes up the corrosive sludge that qualifies as a hazardous substance at issue here. The bankruptcy court found, as a matter of fact, that LDEQ's investigator observed waste oil rather than crude oil at the site. This finding is not

10

clearly erroneous. Because LDEQ knew about a hazardous substance that constituted an environmental violation, we hold that it was enough to put them on notice of the claim under the broad definition of that term applicable in bankruptcy law.

The second argument LDEQ, *et al.,* make is that they could not have known Crystal was the successor to CORC given Crystal's denial that it owned the property. Thus, LDEQ could not tie Crystal to the release of the hazardous substance. Although the evidence on this point was mixed, and included the troubling fact that Crystal provided LDEQ with inaccurate information, it is difficult to find the court's decision to have been clearly in error. The bankruptcy court concluded that LDEQ had searched the conveyance records for Caddo Parish and obtained information tying Crystal to the property. R. at 955-6. Although LDEQ had not ascertained for certain that Crystal was the successor company, it clearly was in the process of investigating Crystal. If Crystal's response had included a factual misrepresentation that misled LDEQ into believing Crystal was not CORC's successor, then there might be a basis for concluding that LDEQ believed it could not tie Crystal to the release of the hazardous substance. Crystal, however, made no such misrepresentation. Instead, it provided LDEQ with no conclusive information at all. The Louisiana Secretary of State assures that mergers and name changes like that which occurred here

11

are matters of public record that can be easily ascertained in a document search, so the old name should have been enough to put LDEQ on the right trail that would have led to Crystal. We therefore find no error in the bankruptcy court's holding that LDEQ's claim was pre-petition.

IV

The next question we must answer is whether Crystal provided LDEQ with adequate notice of its bankruptcy by publishing it in The Wall Street Journal.[2] Under the Supreme Court's longstanding jurisprudence, the debtor must provide actual notice--not notice by publication--to all "known creditors" in order to achieve a legally effective discharge of their claims. City of New York v. New York, N.H. & H.R. Co., 344 U.S. 293, 296 (1953). As the Supreme Court has further explained, however, "known creditors" include both those claimants actually known to the debtor, as well as those whose identities are "reasonably ascertainable." Tulsa Professional Collection Serv., Inc. v. Pope, 485 U.S. 478, 490 (1988). A creditor is "reasonably ascertainable" if it can be discovered through "reasonably diligent efforts." Mennonite Bd. of

_____

[2]There is also a subsidiary question of whether Crystal might have given LDEQ actual notice in the first place. LDEQ concedes that Crystal did give actual notice to the Louisiana Department of Conservation, and, in In re Jensen, 955 F.2d 925 (9th Cir. 1993), notice to a "sister agency" was held to be sufficient in the environmental regulatory context. As we conclude that actual notice is not necessary in this case, we need not address this issue.

Missions v. Adams, 462 U.S. 791, 798 n.4 (1983).  In a somewhat similar case, the Third Circuit held that such efforts need generally include only a careful search of the debtor's own records, and that environmental claimants whose claims are not discoverable therein or otherwise apparent are not "known creditors" for bankruptcy purposes.  Chemetron Corp. v. Jones, 72 F.3d 341, 346-48 (3d Cir. 1995).  In reaching this holding, the Chemetron court stressed that claimants must be reasonably ascertainable, not reasonably foreseeable.  Id. at 348.  As we read these cases, in order for a claim to be reasonably ascertainable, the debtor must have in his possession, at the very least, some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom he would be liable.

LDEQ, *et al.,* make three arguments challenging the bankruptcy court's finding on this issue: (1) Crystal was involved in the oil business throughout the state and had dealt previously with environmental agencies and thus should have contemplated a claim by LDEQ; (2) Crystal intentionally avoided listing LDEQ as a creditor and providing notice; and (3) Because LDEQ had contacted Crystal about the Shoreline site, LDEQ was a "reasonably ascertainable" creditor, and thus a known creditor, entitled to actual notice.

13

The first two arguments can be dispensed of easily.  With respect to the first argument, based on the standard we articulate above, there can be no basis for concluding that a debtor is required to send notices to any government agency that possibly may have a claim against it.  The second argument, that Crystal intentionally avoided listing the LDEQ as a creditor despite an outstanding amount of $135.36 owed to the Air Quality Division of LDEQ, was adequately addressed by the bankruptcy court.  We find no error.

The last argument advanced by LDEQ, *et al.*, that because Crystal received a phone call from LDEQ, it had information that should have led it to conclude that LDEQ had a claim, is a closer issue.  It is undisputed that LDEQ contacted Crystal, identified itself, and asked about the site in question.  Crystal looked into the records it had on hand, and erroneously (but in good faith as far as this record or the contentions of the parties indicate) concluded that it had had no relationship with that property.  The bankruptcy court held that this inquiry was reasonably diligent, because the only records that would have revealed the connection were ancient ones in long-term storage.

As LDEQ did not give Crystal any other reason to think that there might be a claim against it, the bankruptcy court reasoned that LDEQ was not a reasonably ascertainable creditor.  It has been

argued in the briefs, however, that LDEQ informed Crystal during its inquiries that the prior record title holder to the site was CORC. Because we must assume that a company has knowledge of the companies for which it is a successor company, if LDEQ did provide this information, Crystal would have been on notice that whatever problems there were at the site, they would eventually be brought to Crystal's door.

The bankruptcy court also concluded that, regardless of Crystal's knowledge of its link to the site, LDEQ's inquiry did not put it on notice that there were any environmental problems there in the first place. That finding also is open to interpretation in the light of Eddings's memorandum concerning LDEQ's inquiry that warned to "use caution in releasing any information as there could be environmental problems." Thus, it appears arguable that LDEQ might well have been a readily ascertainable creditor deserving actual notice.

Although the evidence could go either way, this is entirely an issue of fact, and our standard of review is therefore one of clear error. We hold that there is no basis in either the testimony or the written documents describing Clements's contact with Eddings to lead us to conclude that the bankruptcy court's findings are clearly erroneous. The bankruptcy court considered the internal memoranda written by Eddings and Caskey along with the testimony of Eddings on this issue. That testimony is clearly consistent with

15

the bankruptcy court's finding that Eddings was never given enough information by Clements to believe that Crystal could be liable for a claim. LDEQ did not present any written or testimonial evidence that might have shed some other light on the conversation between Clements and Eddings. Thus, while reasonable minds could differ on this issue, we must conclude, based on the bankruptcy court's findings, that LDEQ was not a reasonably ascertainable claimant and therefore only entitled to public notice. In sum, the record supports the bankruptcy court's finding that the information in the possession of Crystal, that is the written memoranda and correspondence related to LDEQ's contact with Crystal and Crystal's officers' recollections of that contact, did not suggest that there was a hazardous waste claim for which Crystal would be liable to LDEQ.

V

The final issue we must address is whether LDEQ should nonetheless be allowed to file a late claim on the basis of excusable neglect. We can see no merit to this argument. Under Pioneer Investment Services Co. v. Brunswick Associates L.P., 507 U.S. 380 (1993), the court must consider prejudice to the debtor, length of the delay, and reason for the delay in determining whether the claimant's neglect was excusable. In this case, the bankruptcy court correctly determined that: (1) the prejudice to the debtor would be high, (2) the length of the delay (nine years)

16

was quite long, and (3) the reason for the delay (LDEQ's lack of funds) was unconvincing. In the light of these findings, we cannot say that LDEQ should be allowed to file a nine-year late claim.

VI

In summary, we hold that LDEQ's environmental liability claim against Crystal arose pre-petition for bankruptcy purposes because LDEQ had enough information through which it could have tied Crystal to a known release of a hazardous substance at the point that they found the "Crystal Oil" signs on the property. Despite its phone call to Crystal, LDEQ was not a reasonably ascertainable creditor for bankruptcy purposes, and the notice by publication that it received was therefore sufficient to subject its claim to discharge in bankruptcy. Finally, LDEQ's decade-long delay in bringing its claim was not excusable neglect.

In closing, we should note that this case presented complex issues resolved only by relying on the factual determinations reached by the bankruptcy court. We recognize that the bankruptcy court was confronted with factual disputes presenting close calls and that reasonable minds may differ over their outcome. In bankruptcy cases, however, we owe substantial deference to the bankruptcy court's findings of fact. Here, the factual findings are not clearly erroneous and, given those findings, it is clear that the bankruptcy court did not err in reaching the conclusions that it reached.

17

In accordance with the above-stated reasons, the judgment of the district court is therefore

A F F I R M E D.