**In re ARCH WIRELESS,
et al., Debtors.**

No. 01–47330.

United States Bankruptcy Court,
D. Massachusetts.

Oct. 13, 2005.

Mark N. Polebaum, Boston, MA, for Debtors.

## MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

Before this Court is the "Debtor's Motion for Contempt Against Nationwide Paging, Inc." (the "Motion for Contempt"). Arch Wireless, Inc. (the "Debtor") asks this Court to find Nationwide Paging, Inc. ("Nationwide") in contempt of the discharge injunction entered by this Court upon approval of the Debtor's Chapter 11 plan of reorganization (the "Plan"). The Debtor seeks sanctions for Nationwide's alleged contempt and requests this Court to enjoin Nationwide from pursuing its pre-confirmation claims and defenses against the Debtor in an action currently pending before the Massachusetts state court. The Motion for Contempt raises important due process considerations regarding the notice required to bind parties under a Chapter 11 plan of reorganization.

## I. FACTS AND TRAVEL OF THE CASE

The following facts, with one noted exception, are essentially undisputed. They are taken from the parties' pleadings, the testimony and evidence presented at trial and the docket entries in the Debtor's Chapter 11 bankruptcy case, of which this Court may take judicial notice. See Fed. R.Evid. 201; Fed. R. Bankr.P. 9017.

### A. Pre–Petition Events

The Debtor is a supplier of pagers and paging network airtime. In 1999 and 2000, Nationwide contracted to purchase pagers and to lease paging network airtime from the Debtor. Nationwide, in turn, resold or leased the airtime and pagers to its customers.

In 2000, the Debtor sold Nationwide a large number of pagers which Nationwide claims were defective. Nationwide used

these pagers to fulfill its substantial obligations to supply pagers and airtime to AT & T, under what Nationwide claims was a very lucrative contractual arrangement. When AT & T complained to Nationwide that the pagers were defective, Nationwide turned to the Debtor to identify and correct the problems with the pagers. At that time, Nationwide also identified alleged billing errors on invoices from the Debtor.

On September 14, 2000, Nationwide's President, Peter Brown, sent a letter to Pedro Xavier, a manager at PageNet.[1] Relevant portions of the letter show that, by September 2000. Nationwide was far from satisfied with the Debtor's response to Nationwide's complaints:

> [W]e have a number of issues that need to be cleared up if we are going forward together, and I want to make sure that there is no misunderstanding about any of them.... PageNet has a number of issues to address before we talk about our account, especially since ... I feel that we have prepaid PageNet in the overall scheme of things....
>
> ... [O]ur accounts are still in error... PageNet needs to invoice us correctly.... PageNet has never produced a correct invoice for us.
>
> ... But more importantly, we don't even have use of the equipment for which we've been billed ... The equipment that has been sent to us is of such inferior quality that we've been returning 20% to 30% of it because it won't work .... PageNet is then looking for $9000.00 when only $6,000.00 worth of the equipment works, and we haven't even gotten the replacement equipment yet. To make matters worse, the PageNet shipping people then double and triple bill us....

Virtually all of the equipment that Pagenet has sold to us has arrived at our office with superfluous programming that detracts from the pager's performance.... We discovered ... that there was a programming problem with the pagers .....

I don't know definitively how much this has hurt us. I do know that it has cost us about 400 alpha pagers, our reputation to some degree, and a lot of manhours that should have been devoted elsewhere.... If you cannot fix these problems, I need to know who can, and how I can contact them on an ongoing basis....

... [M]ore needs to be done, and it needs to be tangible.

First, an adjustment (or credit) on our airtime bill needs to be made for all of this inconvenience, and it needs to be meaningful. Second, we need to get *good* equipment at a competitive price.... Third, I have to have confidence that the equipment that we do ship out to our customers has capcodes that have been cleaned so that they contain no excess information that will interfere with their use....

... It's now PageNet's turn to do the right thing. That means showing me that PageNet values our business, and realizes that it's cost us a lot of reputation, time and money, by compensating us for this capcode cleaning fiasco. It also means that PageNet needs to ... adjust the prices we paid for bad equipment....

Brown again wrote to PageNet in November of 2000, this time by email, continuing to voice his dissatisfaction with PageNet's billing practices and response to problems with the pagers. In that email, Brown detailed at least six different al-

---

1. PageNet, once a subsidiary of the Debtor, merged with the Debtor in 2000.

leged billing errors and blamed PageNet for Nationwide's loss of a "substantial customer":

> The AT & T project manager for paging has taken our company out of their automated ordering process. She told me that she was doing this as a result of faulty equipment, and the paging just not working. These were PageNet pagers. We need to address this problem, and our loss caused by PageNet.

Xavier responded to the email by acknowledging certain of the billing errors and concluding with "I am sorry about AT & T."

In February of 2001, in response to an account reconciliation requested by PageNet, Brown sent another communication to the Debtor, this time addressed to Mike Verardo and Mark Amadio at PageNet. There, Brown made it clear that the billing and loss of business issues were far from resolved:

> [W]e should be able to get a correct monthly bill going forward. This does not address the overcharges and discrepancies of the past, which constitute the majority of the bill, nor does it address the defective pagers sold by PageNet, loss of business and refunds we had to make because of the errors on PageNet's part .... [S]ome reciprocity on the part of PageNet is definitely overdue.

Over the subsequent months, the Debtor continued to press Nationwide for payment on its accounts, and Nationwide continued to dispute the amount claimed. In response to a letter from the Debtor, dated August 22, 2001, requesting payment on Nationwide's outstanding accounts, Brown sent two emails, dated September 18, 2001 and September 19, 2001, addressed to Mark Amadio at PageNet. In those communications, Brown detailed the events of the previous year which he claimed had caused damage to Nationwide, and emphasized his belief that the Debtor had not satisfactorily addressed his claims.

In the September 18 email, Brown wrote:

> After we complete the correction of the bill going forward, we need to address the numerous problems with the bills going backward. PageNet, and thus, Arch has overbilled us significantly, and that does not address some of the other issues that have been raised over the course of the last year....

In May of 2000, Nationwide Paging, Inc. ("Nationwide") secured increased paging business of a large multi-national corporation that was supposed to result in substantial additional business for Nationwide.... The anticipated business started in August, 2000.... As no new equipment was available to us from PageNet, we agreed to buy class A, fully refurbished pagers from PageNet .... Upon the start of that new business, we started to experience unusual problems .... We subsequently discovered that the problems included, but were not limited to, getting equipment that had not been refurbished as promised (including defective microprocessors) and pagers that had been delivered to us with improperly programmed capcodes ... PageNet did not fix the problem of the improperly programmed capcodes for over 2 months ... and further delayed fixing the problem. This resulted in further loss of business. After addressing the issue of the defectively programmed capcodes, we were still having problems .... We again exchanged the pagers, and the problems continued.... [W]e not only lost more business, but our company's reputation was harmed. All the while, PageNet was over-billing us for service that did not work, and

that resulted in the loss of a substantial amount of business for Nationwide.

Apparently, Amadio responded to that email with a request for resolution. In his September 19 email, Brown suggested bringing in a third party to audit the outstanding accounts and, in the alternative, proposed an amount Nationwide would pay to resolve the accounts. However, it is clear that even that solution was not intended by Nationwide to satisfy its claims for defective pagers and, particularly, lost business:

> [W]e can arrive at a fixed dollar solution right now. . . . This does not take into consideration any issues of pagers not working. . . .
>
> We also need to deal with the issue of problems with the equipment account as well. . . . There were pagers that were already returned to PageNet, for which we have not been given credit. There are pagers which were previously replaced, for which we have been charged between double and quadruple. . . .
>
> Finally, there is the need to address the problem of the lost business we suffered because of PageNet. . . . I don't know what to say PageNet owes us for that, but I do know that PageNet cost

itself a substantial piece of business, and set back Nationwide's growth an untold amount. Frankly, it may not be possible to resolve this issue at the same time as we resolve all of the billing issues, but I wanted you to at least be aware of these concerns.

> Hopefully, Mark, we'll reach the executive decision that we both seek. . . . I'm sure that both of us will want our lawyers to look over, and approve what we agree to. In that vein, would you please send me a copy of our contract as you (PageNet/Arch) have it, so that when I do seek a lawyer, I can give him the entire picture?

## B. The Bankruptcy Case and Plan Confirmation

The Debtor filed a petition under Chapter 11 of the Bankruptcy Code on December 6, 2001. Nationwide was not listed as a creditor on the Debtor's schedules and statements filed with the Court,[2] and it is undisputed that Nationwide did not receive formal notice of the Debtor's Chapter 11 bankruptcy filing.[3] It appears, however, that Brown was generally aware of the bankruptcy filing in December of 2001,[4]

---

**2.** The Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules" or the "Rules") require debtors to file a list of all their creditors. Fed. R. Bankr.P. 1007(a).

**3.** Under Bankruptcy Rule 2002(f), the bankruptcy court clerk must notify all creditors of the order for relief (i.e., in voluntary cases, the debtor's filing of a bankruptcy petition). In sending those notices, the clerk relies on the list of creditors and their addresses provided by the debtor, unless a creditor requests otherwise. *See* Fed. R. Bankr.P.2002(g)(2).

**4.** Throughout trial, the question of whether Brown had actual notice of the Debtor's bankruptcy filing has been hotly disputed and has consumed much of the parties' time and efforts on this matter. Despite the lack of formal notice, the Debtor has gone to great

lengths to prove that Brown had a general awareness of the Debtor's bankruptcy filing. Owing to the Debtor's status in the paging industry, the bankruptcy filing was widely reported by the media. This fact, combined with the fact that the Debtor was one of only two suppliers of pagers and airtime to Nationwide, renders it highly probable that Nationwide was generally aware that the Debtor had filed for bankruptcy in December of 2001. Although Brown testified at trial that a personal family matter consumed much of his time between December of 2001 and May of 2002. Nationwide's post-trial memorandum admits the possibility that Brown was aware of the Debtor's bankruptcy filing. This factual dispute is, however, irrelevant for reasons detailed below, and this Court will assume Brown's general awareness of the Debtor's

although neither Brown nor an attorney on his or Nationwide's behalf filed a notice of appearance in the case.

On February 5, 2002, this Court issued an order setting March 29, 2002 as the deadline by which all creditors should file proofs of claims in the Debtor's bankruptcy case (the "Bar Date"), or be forever barred from asserting pre-petition claims against the Debtor.[5] That order further required the Debtor to send notice of the Bar Date, by first class mail, to all persons or entities listed in the Debtor's schedules or otherwise known to the Debtor who were entitled to that notice; and to publish notice of the Bar Date in USA Today and the Wall Street Journal. Those notices were published on February 11, 2002 and February 21, 2002, respectively. It is undisputed that the Debtor did not send notice of the Bar Date to Nationwide, and there is no evidence that Nationwide had any informal notice or actual knowledge of the Bar Date.

Apparently, the billing dispute between Nationwide and the Debtor continued post-petition, with the Debtor pressing Nationwide for payment on its outstanding accounts and threatening to terminate Nationwide's paging airtime service. On April 18, 2002, in response to a letter from the Debtor dated April 9, 2002, Nationwide attempted to settle the matter by sending the Debtor a check for $14,000.00 with a restrictive endorsement. The letter included with that check reiterated Nationwide's position regarding the amounts owed, and stated:

> This letter is written as a result of our receipt of your letter dated April 9, 2002 in which you allege that Nationwide Paging, Inc. owes you $14,264.74. . . . Once again you are sending erroneous invoices to us. . . . Each month starting in August 2000, we have requested the correction of our invoices with PageNet, and then with Arch Wireless. First PageNet, and now Arch Wireless have done nothing to correct our invoices. Therefore, I am going to pay the amount demanded in your above-referenced letter under protest, and as full and complete settlement for all charges incurred prior to April 1, 2002. . . .

Upon receipt of that letter, the Debtor deposited the check, but did not respond to Nationwide with notice of the Debtor's pending Chapter 11 bankruptcy, nor did the Debtor amend its schedules or statements to include Nationwide as a creditor.

The hearing on confirmation of the Debtor's Plan (the "Confirmation Hearing") was set for May 8, 2002 and the Debtor was ordered to send notice of the hearing, by first-class mail, to all creditors and to publish that notice in the Wall Street Journal and the Boston Globe. Those notices were published on April 21, 2002. After an extensive hearing before this Court, the order confirming the Debtor's Plan (the "Confirmation Order") entered on May 15, 2002 and the Plan became effective as of May 29, 2002 (the "Effective Date"). It is undisputed that Nationwide did not receive a copy of the Debtor's Plan or notice of the Confirma-

---

bankruptcy filing in December of 2001. *See also In re Spring Ford Indus., Inc.*, 2003 WL 21785960, *1, 2003 Bankr.LEXIS, *2 (Bankr. E.D.Pa. July 25, 2003) ("factual assertions in pleadings, which have not been superceded by amended pleadings, are judicial admissions against the party that made them.") (citing *Larson v. Groos Bank.*, 204 B.R. 500, 502 (W.D.Tex.1996)).

5. Bankruptcy Rule 3003(c)(3) requires the court to fix the time within which proofs of claim may be filed. *Compare* Fed. R. Bankr.P. 3002(c) (setting the time for filing proofs of claim in Chapter 7 or Chapter 13 cases as 90 days after the first date set for the meeting of creditors required by § 341).

tion Hearing, the Confirmation Order or the Effective Date.

Under the Confirmation Order, the Plan is binding on all persons or entities holding a claim against the Debtor. The Confirmation Order also enjoined persons holding a claim against the Debtor from asserting any claim discharged under the Confirmation Order and the Plan ("the Discharge Injunction"). The relevant portions of the Confirmation Order and the Plan discharged the Debtor from all claims, known or unknown, that arose prior to the date of the Confirmation Order.[6]

## C. Post–Confirmation Events

The billing issues having not been resolved to the Debtor's satisfaction, the Debtor began terminating Nationwide's paging airtime services on June 4, 2002.

Nationwide promptly filed suit, on June 5, 2002, in the Commonwealth of Massachusetts Superior Court Department of the Trial Court (the "Superior Court"), seeking a temporary restraining order against the Debtor to prevent further disruption of its paging services. The Superior Court issued a temporary restraining order on June 5, 2002, ordering the Debtor to reinstate Nationwide's paging services and prohibiting further termination of those services. Although a preliminary injunction was apparently never entered in the Superior Court action, the parties have represented to this Court that the temporary restraining order remains in effect.

In addition to its request for injunctive relief, Nationwide sought a declaratory judgment regarding the amount, if any, it

---

**6.** More specifically, the Confirmation Order provided, in relevant part:

. . .

34. *Binding Effect.* In accordance with section 1141 of the Bankruptcy Code and immediately upon entry of the Confirmation Order, the Modified Plan and its provisions shall be binding upon . . . any holder of a Claim against or interest in the Debtors . . . whether or not such holder or entity has accepted the Modified Plan.

. . .

53. *Permanent Injunction* . . . . [A]ll persons who have held, hold or may hold Claims against or interests in the Debtors are permanently enjoined from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action, Cause of Action or other proceeding . . . against or affecting the Reorganized Debtors or the Estates on account of or respecting any Claim, Interest, obligation, debt, right, Cause of Action, remedy or liability discharged, released or to be released pursuant to Article X of the Modified Plan . . . (iv) asserting, directly or indirectly, any setoff, right of subrogation or recoupment right of any kind in respect of any Claim against any debt, liability or obligation due to the Reorganized Debtors or the Estates on account of or respecting any Claim, obligation, debt, right, Cause of Action, remedy or liability discharged, released or to be

released pursuant to Article X of the Modified Plan; or (v) commencing or continuing any action or proceeding in any manner or in any place whatsoever that does not conform to or comply with the provisions of the Modified Plan.

. . .

54. *Discharge of Debtors* . . . . (2) on the Effective Date, all Claims against, or Interests in, the Debtors and the Reorganized Debtors shall be satisfied, discharged, and released in full, and (3) all Persons shall be precluded from asserting against the Debtors, the Reorganized Debtors or any of their successors or assets or properties any other or further Claims or Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date. . . . [C]onfirmation will, as of the Effective Date, discharge the Debtors from all Claims or other debts that arose before the Effective Date . .

. . .

63. *Binding Effect.* Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code and the provisions of this Confirmation Order, the Modified Plan and the Plan Supplement shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

. . .

owed to the Debtor. Nationwide also sought damages under the Massachusetts Consumer Protection Law, M.G.L. ch. 93A ("Chapter 93A Claims"), allegedly caused by the Debtor's over-billing, the defective pagers and the failure to credit Nationwide for the defective pagers.

The Debtor filed its Answer and Counterclaim on June 28, 2002, denying Nationwide's allegations under the Chapter 93A Claims, and counter-claiming for the remaining amounts outstanding on Nationwide's accounts. Nowhere in its answer did the Debtor refer to the bankruptcy proceedings pending before this Court, nor did it raise the Discharge Injunction under the Confirmation Order or the Plan as a defense to the pre-confirmation claims asserted by Nationwide.

For almost two years, the Debtor and Nationwide proceeded through pre-trial stages before the Superior Court before the Debtor notified Nationwide and the Superior Court of this Court's Confirmation Order. Indeed, Nationwide and the Debtor engaged in lengthy discovery before the Superior Court and presented a Joint Pre–Trial Memorandum on September 25, 2003. Trial was originally set for March 29.2004, but was postponed in February of 2004 due to discovery disputes. Then, according to the Debtor, in February 2004, "Nationwide revealed for the first time that it [sought] damages of $4 million" in the Superior Court action. That allegation apparently jolted the Debtor out of its somnolence. The Debtor suddenly recalled filing for Chapter 11 bankruptcy protection, the entry of the Confirmation Order and the Discharge Injunction. On March 2, 2004, counsel for the Debtor sent an email to Nationwide's counsel with copies of the Confirmation Order and the Plan. Nationwide told the Debtor that it would not dismiss the pending Chapter 93A Claims and would continue to raise pre-confirmation events as a defense to the Debtor's counter-claims. On March 18, 2004, the Debtor responded with a letter "formålly demanding" that Nationwide "withdraw with prejudice all claims asserted by Nationwide ... based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to May 15, 2002."

On March 24, 2004, the Debtor filed the instant Motion for Contempt. An evidentiary hearing followed. The Superior Court action has been stayed pending resolution of the Motion for Contempt.

## II. *POSITIONS OF THE PARTIES*

The Debtor has brought its Motion for Contempt against Nationwide in an effort to enjoin Nationwide from asserting affirmative claims and rights of setoff based on the Debtor's pre-confirmation actions. Relying on §§ 542(a)(2) and 1141(d)(1)(a) of the United States Bankruptcy Code,[7] the Debtor contends that those claims were discharged by the Confirmation Order. Accordingly, the Debtor says, Nationwide's continued assertion of its pre-confirmation claims are in contempt of this Court's orders. In an apparent effort to mitigate the effect of the Debtor's 20–month delay in raising the Confirmation Order and Discharge Injunction in the Superior Court action, the Debtor seeks a sanction award in an amount equal only to its attorney's fees and costs incurred in bringing the present Motion for Contempt and in litigating the Superior Court action after notifying Nationwide, on March 2,

---

7. Unless otherwise stated, all statutory references are to Title 11 of the United States Code (the "Bankruptcy Code" or the "Code").

2004, of the Debtor's Chapter 11 Plan confirmation and the Discharge Injunction.

Nationwide opposes the Motion for Contempt on grounds that it is not bound by the Discharge Injunction, because Nationwide did not receive adequate notice of the Bar Date, the Confirmation Hearing or the Confirmation Order. Although admitting that Brown likely had a general awareness of the Debtor's Chapter 11 filing, Nationwide argues that constitutional due process required notice of key bankruptcy events before Nationwide could be bound by the Plan and have its pre-confirmation claims discharged by the Confirmation Order.

Nationwide also raises the defense of laches, arguing that the Debtor's active participation in the Superior Court action and its inexplicable delay in raising the Confirmation Order bars the Debtor from now seeking to enjoin Nationwide's pre-confirmation claims or to recover its attorneys fees and costs for Nationwide's alleged contempt.

The Debtor says that Nationwide's due process argument is without merit. According to its reading of the case law, since Nationwide had actual knowledge, albeit general, that the Debtor had filed for Chapter 11 bankruptcy relief, the burden of further inquiry passed to Nationwide. Under this theory, due process is not offended by the Debtor's failure to property notify Nationwide of critical bankruptcy events. Rather, Nationwide had the duty to come forward before the bankruptcy court with its claim and to ascertain applicable deadlines and hearings in the Debtor's bankruptcy case.

The Debtor further argues that notice of the Bar Date and Confirmation Order by publication provided constitutionally sufficient notice as to Nationwide, because Nationwide was an "unknown" creditor. That is, the Debtor's books and records showed a balance owing from Nationwide at the time of the bankruptcy filing; therefore, Nationwide's status as a creditor was not reasonably ascertainable. According to the Debtor, Nationwide's complaints regarding over-billing and defective pagers were nothing more than a "customer service matter" and its claims against the Debtor were merely conjectural and speculative.

Finally, the Debtor argues that the doctrine of laches does not bar its Motion for Contempt. Although acknowledging that it has no rational explanation for its 20–month delay in raising the Confirmation Order and Discharge Injunction in the Superior Court, the Debtor says that Nationwide has not shown any prejudice or specific harm caused by that delay. Because Nationwide has continually asserted that the Discharge Injunction does not apply to its claims, and that it would continue to raise those claims as a defense to the Debtor's counter-claims, the Debtor says that Nationwide has failed to prove it would have done anything differently had the Debtor raised the Confirmation Order and Discharge Injunction earlier.

## III. *DISCUSSION*

### A. The Confirmation Order and Discharge Injunction

 Generally, confirmation of a Chapter 11 plan of reorganization binds the debtor and all creditors to the terms of the plan, *see* 11 U.S.C. § 1141(a), and, to the extent provided for in the plan, discharges claims against the debtor that arose prior to the confirmation date. *See* 11 U.S.C. § 1141(d)(1)(a) ("the confirmation of a plan ... discharges the debtor from any debt that arose before the date of such confirmation."). This discharge is reinforced by § 524(a)(2). which provides:

(a) A discharge in a case under [the Bankruptcy Code]—

. . .

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor . . .

Under the Bankruptcy Code, "debt" includes the types of claims asserted by Nationwide in the Superior Court action.[8] Because they are based on the Debtor's pre-confirmation activities, Nationwide's claims would, under the normal operation of the Bankruptcy Code, be discharged by the confirmation of the Debtor's Plan and Nationwide would be in violation of the Discharge Injunction contained in the Confirmation Order, the Plan and § 524(a)(2). Damages for that contempt could be awarded under § 105(a).[9] *Bessette v. Avco Fin., Servs., Inc.*, 230 F.3d 439, 444–45 (1st Cir.2000).

 The normal operation of the Bankruptcy Code, however, is predicated on the satisfaction of constitutional standards of due process. Where a creditor's claim is adversely affected by the operation of federal bankruptcy laws, that creditor is entitled to notice consistent with the Due Process Clause of the Fifth Amendment to the United States Constitution. *See Fogel v. Zell*, 221 F.3d 955, 962 (7th Cir.2000); *United States v. Hairopoulos (In re Hairopoulos)*, 118 F.3d 1240, 1244 (8th Cir.1997); *In re Harbor Tank Storage Co.*, 385 F.2d 111, 116 (3d Cir.1967); *Oak-*

*fabco, Inc. v. Am. Standard, Inc.*, 297 B.R. 720, 730 (Bankr.N.D.Ill.2003); *In re XO Commc'ns. Inc.*, 301 B.R. 782, 791–92 (Bankr.S.D.N.Y.2003); *Circle K Stores, Inc. v. Montana Dep't of Revenue (In re Circle K Corp.)*, 198 B.R. 784, 789 (Bankr. D.Ariz.1996). Therefore, if a creditor is not given adequate notice of the bar date for filling claims, the hearing on plan confirmation or the order confirming a plan in a Chapter 11 case, the creditor may not be bound by the plan provisions and its claim is not discharged. "A creditor's claim cannot be subjected to a confirmed plan that it had no opportunity to dispute." *Kewanee Boiler Corp.*, 297 B.R. at 730; *see also Chemetron Corp. v. Jones*, 72 F.3d 341, 347 (3d Cir.1995); *Dalton Dev. Project # 1 v. Unsecured Creditors Comm. (In re Unioil)*, 948 F.2d 678, 683 (10th Cir.1991); *Spring Valley Farms v. Crow (In re Spring Valley Farms, Inc.)*, 863 F.2d 832, 834 (11th Cir.1989); *In re Greater Se. Cmty. Hosp. Corp.*, 327 B.R. 1, 5 (Bankr. D.C.2005); *Grant v. U.S. Home Corp, (In re U.S.H. Corp. of N.Y.)*, 223 B.R. 654, 658 (Bankr.S.D.N.Y.1998); *In re Circle K Corp.*, 198 B.R. at 789; *McGlinn v. Sullivan Ford Sales, Inc. (In re Sullivan Ford Sales, Inc.)*, 25 B.R. 400, 402 (Bankr.D.Me. 1982).

### B. Due Process: Notice Required

The Bankruptcy Rules prescribe the relevant notice requirements in Chapter 11

---

**8.** "Debt" is defined in § 101(12) as "liability on a claim." A "claim" under the Bankruptcy Code is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, *disputed*, undisputed, legal, equitable, secured or unsecured" and also includes a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment." 11 U.S.C. § 101(5) (emphasis added).

**9.** 11 U.S.C. § 105(a) provides:

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

cases. Creditors must receive notice of bankruptcy filing, *see* Fed. R. Bankr.P. 2002(f), notice of the deadline for filing proofs of claim, *see* Fed. R. Bankr.P. 2002(a), a copy of the reorganization plan, *see* Fed. R. Bankr.P.2002(b), 3017(d), notice of the hearing on confirmation of a Chapter 11 plan, *see* Fed. R. Bankr.P. 3017(d), and the order confirming the plan, *see* Fed. R. Bankr.P.2002(f). It is undisputed that Nationwide did not receive the notices required under those provisions.

■ Non-compliance with the Bankruptcy Rules does not, however, necessarily mean that constitutional standards for due process have been left unsatisfied. Rather, the notice required by due process is "notice reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950);[10] *see also Francis v. Eaton (In re Eaton),* 327 B.R. 79, 82–83 (Bankr.D.N.H.2005) ("Notice need not be perfect but reasonable based on the circumstances.") (citing *In re San Miguel Sandoval,* 327 B.R. 493 (1st Cir. BAP 2005); *In re DCA Dev. Corp.,* 489 F.2d 43, 47 (1st Cir.1973); *In re Intaco Puerto Rico. Inc.,* 494 F.2d 94, 98 (1st Cir.1974)). Because the notice require-

ments under the Bankruptcy Rules are designed to provide procedurally adequate notice, however, debtors disregard them at their peril.[11]

In the context of Chapter 7 or Chapter 13 bankruptcy cases, some courts have held that a creditor's actual knowledge of the bankruptcy filing or of the meeting of creditors required by § 341 imposes a duty on the creditor to come forward with its claim before the bankruptcy court and that formal notice of the claims bar date is not required by due process. *See, generally, Zidell, Inc. v. Forsch (In re Coastal Alaska Lines, Inc.),* 920 F.2d 1428 (9th Cir.1990); *Yukon Self Storage Fund v. Green (In re Green),* 876 F.2d 854 (10th Cir.1989); *Lawrence Tractor Co. v. Gregory (In re Gregory),* 705 F.2d 1118 (9th Cir.1983); *In re Eaton,* 327 B.R. 79. The Debtor would have this Court adopt the same reasoning to Chapter 11 cases and find that Nationwide's general awareness of the Debtor's bankruptcy filing satisfied its right to due process.

■ The case law, however, is overwhelmingly to the contrary. "[T]he creditor who is not given notice, even if he has actual knowledge of reorganization proceedings, does not have a duty to investigate and inject himself into the proceed-

**10.** As noted by the court in *Chemetron Corp. v. Jones,* "[a]lthough Mullane involved the notice due beneficiaries on judicial settlement of accounts by the trustee of a common trust fund, subsequent courts have interpreted the case to set the standard for notice required under the Due Process Clause in Chapter 11 bar date cases." 72 F.3d at 346 n. 1 (citing *In re Pettibone Corp.,* 162 B.R. 791, 806 (Bankr.N.D.Ill.1994); *In re R.H. Macy & Co.,* 161 B.R. 355, 359 (Bankr.S.D.N.Y.1993)).

**11.** *See, e.g., W. Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.),* 43 F.3d 714, 721 (1st Cir.1994) ("Bankruptcy Code § 102(1) [requiring 'appropriate notice' in

bankruptcy cases] is founded in fundamental notions of procedural due process."); *In re Spring Valley Farms,* 863 F.2d at 834 (citing *Sheftelman v. Standard Metals Corp.,* 839 F.2d 1383, 1386 (10th Cir.1987); *Reliable Elec, Co., Inc. v. Olson Const. Co.,* 726 F.2d 620, 622–23 (10th Cir.1984)); *Kewanee Boiler Corp.,* 297 B.R. at 730 ("Notice is the cornerstone underpinning Bankruptcy Code procedure.") (citing *In re Savage Indus.*); *In re Circle K Corp.,* 198 B.R. at 789 ("The noticing requirements imposed by the Code and Rules ensure that creditors can be expected to learn of important actions in a bankruptcy that affect their rights.").

ings."[12] If a known creditor of a Chapter 11 corporate debtor is not provided with notice of the bar date for filing proofs of claim or the hearing on plan confirmation, that creditor will not be bound by confirmation of the plan and its claims will not be discharged.[13]

Furthermore, Supreme Court and First Circuit precedent, by which this Court is bound, compel the conclusion that Nationwide was entitled to "assume that the statutory 'reasonable notice' w[ould] be given to [it] before [its] claims [were] forever barred." *New York*, 344 U.S. at 297, 73 S.Ct. 299. "[T]he fact that the creditor may, as here, be generally aware of the pending reorganization, does not of itself impose upon him an affirmative burden to intervene in that matter and present his claim." *Intaco*, 494 F.2d at 99. Although both *New York* and *Intaco* were decided under the prior Bankruptcy Act, the rules they articulate apply with the same force under current law.[14]

**12.** *Levin v. Maya Constr, (In re Maya Constr., Co.)*, 78 F.3d 1395, 1399 (9th Cir.1996); *Fogel v. Zell*, 221 F.3d at 964; *In re Unioil*, 948 F.2d at 683–84; *In re Spring Valley Farms*, 863 F.2d at 834; *Chemetron Corp. v. Jones*, 72 F.3d at 345; *Broomall Indus., Inc. v. Data Design Logic Sys., Inc.*, 786 F.2d 401, 405 (Fed.Cir.1986); *Reliable Elec.*, 726 F.2d at 623; *In re Greater Se. Cmty. Hosp.*, 327 B.R. at 6; *In re XO Commc'ns*, 301 B.R. at 791–92; *In re Circle K Corp.*, 198 B.R. at 789; *Niamoli v. Anchor Glass Container Corp. (In re Anchor Glass Container Corp.); see also New York v. N.Y., N.H. & Hartford R.R.*, 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333 (1953) (under prior Bankruptcy Act, creditor of reorganized debtor with general knowledge of bankruptcy proceedings was not bound by confirmation of plan where creditor received no notice of confirmation hearings); *In re Harbor Tank Storage Co.*, 385 F.2d at 115 (under prior bankruptcy legislation, due process required notice of bar date for filing proofs of claim and hearings on confirmation of reorganization plan); *Intaco*, 494 F.2d 94; *accord In re Savage Indus.*, 43 F.3d at 721 (where sale of substantially all of Chapter 11 debtor's assets was essentially equivalent to confirmation of a Chapter 11 plan, parties in interest who did not receive notice could not, consistent with due process, be bound by terms of sale).

**13.** Many courts have recognized that the procedural and statutory differences between Chapter 7 and Chapter 13 cases on the one hand, and Chapter 11 on the other, give rise to different due process standards for notice of certain bankruptcy events:

Unlike in a Chapter 7 [or Chapter 13] case, the Chapter 11 bar date [for filing proofs of claim] is not set by the Federal Rules of Bankruptcy Procedure. Thus, notice of the bankruptcy does not afford the creditor the information necessary to determine the applicable bar claims date. The Chapter 11 creditor with actual notice would need to constantly search for the latest court orders, which could be entered at any time. For that reason, the burden is on the Chapter 11 debtor to cause formal notice to be given to creditors. *Maya, supra*, 78 F.3d at 1399. A creditor who is not given notice, even if it has actual knowledge of the reorganization, does not have a duty to investigate or inject itself into the proceedings. *Id.*

*Brunswick Hosp. Ctr., Inc. v. N.Y. Dep't of Health (In re Brunswick Hosp. Ctr., Inc.)*, 1997 WL 836684, *5, 1997 Bankr.LEXIS 2184, *17 (Bankr.E.D.N.Y. Sept. 12, 1997).

**14.** The Debtor relies on *Sequa Corp. v. Christopher (In re Christopher)*, 28 F.3d 512, 517 (5th Cir.1994), for the proposition that, even in a Chapter 11 case, a creditor with knowledge of a debtor's bankruptcy proceeding bears the burden of coming forward with its claim and due process is not offended by treating actual knowledge of the bankruptcy as sufficient. *Sequa* is to some extent distinguishable, and, to the extent on point, this Court respectfully disagrees with its teaching. First, *Sequa* dealt with a *post*-petition creditor who had knowledge of the debtor's bankruptcy filing at the time the creditor chose to conduct business with the debtor. Second, the *Sequa* opinion is arguably inconsistent with the vast majority of courts to consider similar issues. *See, e.g., In re Unioil*, 948 F.2d at 682–83 (known post-petition creditors not bound by Chapter 11 debtor's confirmed reorganization plan because creditors had not received notice of the bar date or confirmation hearing); *see also*, cases cited *supra*, footnote

For these reasons, it is essentially irrelevant whether Brown actually knew that the Debtor had filed for bankruptcy in December of 2001; that knowledge was not sufficient to bind Nationwide by the Debtor's Plan or to discharge Nationwide's pre-confirmation claims consistent with the Due Process Clause.

### C. "Known" versus "Unknown" Creditors

■ The Debtor has yet another argument. It notes that where a creditor is "unknown," notice by publication of the final date for filing proofs of claim or of the hearing on confirmation of the debtor's plan is sufficient to satisfy due process. *See Chemetron Corp. v. Jones, 72 F.3d at 346; In re Feldman,* 261 B.R. 568, 577 (Bankr.E.D.N.Y.2001); *In re U.S.H. Corp.,* 223 B.R. at 658. The Debtor contends that Nationwide was an "unknown" creditor and, thus, notice by publication was sufficient to bind Nationwide by the Plan and to discharge its claims.

■ A "known" creditor is one who is actually known or whose identity is "reasonably ascertainable by the debtor." *Tulsa Prof'l Collection Serv., Inc. v. Pope,* 485 U.S. 478, 490, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988); *see also In re U.S.H. Corp.,* 223 B.R. at 659. Whether a creditor's claims were reasonably ascertainable must be determined by the circumstances of the case, with an eye toward whether the facts "would alert the reasonable debtor to the possibility that a claim might reasonably be filed against it." *In re Drexel Burnham Lambert Group, Inc.,* 151 B.R. 674, 681 (Bankr.S.D.N.Y.1993); *see also Chemetron Corp. v. Jones,* 72 F.3d at 346. Although a review of a debtor's books and records forms the basis for this inquiry. "a debtor is obligated ... to take undertake more than a cursory review of its records and files to ascertain its known creditors," *In re Drexel,* 151 B.R. at 681, and a creditor is "known" if identifiable through "reasonably diligent efforts." *Mennonite Bd. of Missions v. Adams,* 462 U.S. 791, 798 n. 4, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983); *see also In re U.S.H. Corp.,* 223 B.R. at 659. "Unknown" creditors, in contrast, are those whose "interests are either conjectural or, although they could be discovered upon investigation, do not in the due course of business come to [the debtor's] knowledge." *Mullane,* 339 U.S. at 317, 70 S.Ct. 652. They include creditors whose claims are "merely 'conceivable, conjectural or speculative.' " *In re XO Commc'ns,* 301 B.R. at 793.

■ The debtor bears the responsibility of providing the bankruptcy clerk with a list of all of its creditors, *see* Fed. R.

---

6. Finally, the *Sequa* court distinguished *New York* and *Intaco* as based on statutory rather than constitutional law, and therefore considered itself not bound by the *New York* holding. This Court however, agrees with those courts that have recognized that the Supreme Court's holding in *New York* (and, consequently, the First Circuit's holding in *Intaco,* which relied on *New York*) is founded on due process concerns and is not a limited pronouncement of statutory law. *See New York,* 344 U.S. at 297, 73 S.Ct. 299 ("The statutory command for notice embodies a *basic principle of justice—that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights.*") (emphasis added); *see also In re Maya Constr.,* 78 F.3d at 1399 (holding that *New York* applies under the current Code and finding the required notice to be a "matter of due process."); *In re Spring Valley Farms,* 863 F.2d at 835 ("The language in *City of New York* clearly is not grounded in goals unique to the former bankruptcy act. The Court's emphasis on notice and opportunity to be heard underlines a due process concern."); *In re Harbor Tank Storage,* 385 F.2d at 115; *Broomall,* 786 F.2d 401 (recognizing *New York* as pronouncing due process limitations applicable to reorganization proceedings); *In re Greater Se. Cmty Hosp.,* 327 B.R. at 6 (equating the "rule of [*New York* ]" with due process requirements).

Bankr.P. 1007(a), and sending notice of certain key bankruptcy events. Because the debtor thus controls who receives notice, it is the *debtor's* knowledge of a creditor, not the creditor's knowledge of his claim, which controls whether the debtor has a duty to list that creditor. *In re Maya Constr.*, 78 F.3d at 1398 (citing *In re Hi–Lo Powered Scaffolding, Inc.*, 70 B.R. 606, 610 (Bankr.S.D.Ohio 1987)); *see also In re Circle K Corp.*, 198 B.R. at 790 (large number of creditors does not lessen debtor's duty to file accurate list of creditors). "[T]he debtor must have in his possession at the very least, some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom he would be liable." *La. Dep't of Envtl. Quality v. Crystal Oil Co. (In re Crystal Oil Co.)*, 158 F.3d 291, 297 (5th Cir.1998).

Given the foregoing, the Debtor's assertion that Nationwide was an "unknown" creditor is wholly unpersuasive. The Debtor relies solely on the fact that its books, at all relevant times, showed a balance owed on Nationwide's accounts. When viewed in context, however, this fact alone is hardly dispositive. The Debtor admits that Nationwide refused to pay the amounts due because Nationwide believed it had been over-billed and had suffered compensable damages as a result of defective pagers provided by the Debtor. Nationwide repeatedly asserted its claims against the Debtor in writing. The communications sent from Brown to the Debtor in September and November of 2000 and in February and September of 2001 clearly articulate Nationwide's belief that the Debtor was liable to Nationwide for affirmative compensation and offsets on its accounts. Thus, the Debtor had in its possession several writings evidencing a claim asserted against it by Nationwide. And the outstanding and overdue accounts were clearly an ongoing concern that occu-

pied the Debtor's attention. The fact that the Debtor disputed Nationwide's allegations has no bearing on whether Nationwide was, in fact, asserting a claim against the Debtor within the meaning of the Bankruptcy Code. *See In re Spring Ford Indus., Inc.*, 2003 WL 21785960, *3, 2003 Bankr.LEXIS 882, *10 (Bankr.E.D.Pa. July 25, 2003) ("While the Debtor contests the claims asserted by the Claimants, they are still claims under the Bankruptcy Code, 11 U.S.C. § 101(5), ... and the holders are creditors, 11 U.S.C. § 101(10)."); *In re Arnold Print Works, Inc.*, 47 B.R. 288, 289 (Bankr.D.Mass.1985) (entity "must be considered a 'known creditor' even though its claim is disputed by the Debtor" and "should have been listed by the Debtor on the schedules at least as a disputed or potential claim.").

Had the Debtor taken more than a "cursory review" of its accounts and records, it would have immediately identified Nationwide as an entity that qualified as a creditor under the Bankruptcy Code. To do so would have required no Herculean efforts, but merely a reasonable inquiry into its own records. Nationwide's status as a creditor was "reasonably ascertainable." Accordingly. Nationwide was a "known" creditor at the time the Debtor filed for protection under Chapter 11 and at the time all required notices were sent to other creditors. Even though Nationwide may have been generally aware of the Debtor's bankruptcy proceedings, it still had "a right to assume that the statutory 'reasonable notice' [would be] given [to Nationwide] before [its] claims were forever barred." *New York*, 344 U.S. at 296, 73 S.Ct. 299. Since this notice was not provided, Nationwide's pre-confirmation claims cannot, consistent with due process, have been discharged by the Debtor's Plan or Confirmation Order.

**256**

### IV. *CONCLUSION*

Nationwide was a known creditor at the time the Debtor filed for Chapter 11 relief under the Bankruptcy Code, and was entitled to the notice required by the Code and the Rules. Because the Debtor failed to provide to Nationwide notice of the Bar Date, the Confirmation Hearing and the Confirmation Order, Nationwide's pre-confirmation claims against the Debtor were not discharged under § 1141(a) and (d)(1)(A) by the entry of the Confirmation Order. The discharge injunction under § 524(a)(2) is therefore inapplicable.[15] The Debtor's Motion for Contempt is, accordingly, DENIED.

A separate order in conformity with this Memorandum of Decision shall enter herewith.

15. Because this Court holds that the Discharge Injunction is inapplicable to Nationwide's claims, it does not reach the question of the applicability of the doctrine of laches in this case.